79 A.3d 595

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Christopher RONEY, Appellant.**

Supreme Court of Pennsylvania.

Submitted April 15, 2011.

Decided Oct. 30, 2013.

4

8

Helen A. Marino, Esq., James H. Moreno, Esq., Defender Association of Philadelphia, for Christopher Roney.

Hugh J. Burns, Esq., Philadelphia District Attorney's Office, Amy Zapp, Esq., PA Office of Attorney General, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.

## *OPINION*

Justice McCAFFERY.

Christopher Roney ("Appellant") appeals from the denial of his petition filed pursuant to the Post Conviction Relief Act [1] ("PCRA"), following his conviction of first-degree murder and other offenses, the imposition of a sentence of death, and this Court's affirmance of his judgment of sentence. We affirm the order of the PCRA court.

The relevant facts of this case are as follows. [2] On January 2, 1996, at approximately 8:20 a.m., Appellant and another man, subsequently identified as Mark Canty, entered a PNC Bank branch located on Rising Sun Avenue in Philadelphia and ordered the employees to open the vault. Canty forced two of the female employees toward the vault at gunpoint, and Appellant remained near the front of the building with the bank manager, Loretta Johnson. While the employees were attempting to open the vault, Canty shouted "here comes the heat," and Appellant responded "don't worry, I'll take care of

1. 42 Pa.C.S. §§ 9541–46.
2. A full recitation of the facts of the crime is set forth in our decision affirming the judgment of sentence. *Commonwealth v. Roney*, 581 Pa. 587, 866 A.2d 351 (2005).

them." *Commonwealth v. Roney,* 581 Pa. 587, 866 A.2d 351, 353 (2005). Philadelphia Police Officer Lauretha Vaird, the first officer to respond to a report of a robbery in progress, then entered the bank via the front door, and Appellant fatally shot her in the abdomen. Appellant fled through the front door, heading toward a waiting green van driven by a third perpetrator, Warren McGlone. As Appellant was running to make his escape, he encountered Officer Donald Patterson, the second police officer to arrive on the scene. Officer Patterson fired his weapon at Appellant, but Appellant managed to enter the van and McGlone then sped away from the scene. Canty also escaped, fleeing from the bank building via a side door.

The get-away van was found abandoned later the same day in Philadelphia. At the crime scene, specifically on the sidewalks near the bank, police discovered two loaded firearms: a 9 millimeter handgun and a silver .380 caliber Lorcin revolver. The Bureau of Alcohol, Tobacco and Firearms ("ATF") traced both firearms: the 9 millimeter handgun to one Richelle Parker, who had purchased the gun for McGlone, a friend of hers, and the Lorcin revolver to one Anthony Brown, a relative of Canty. Canty and McGlone both gave inculpatory statements to police admitting their involvement in the robbery.

Appellant, Canty, and McGlone were charged with multiple crimes and tried together. Appellant presented a misidentification/alibi defense. On October 30, 1996, a jury convicted Appellant of first-degree murder, three counts of robbery, and one count each of conspiracy, aggravated assault, burglary, and possession of an instrument of crime ("PIC").[3] McGlone and Canty were each convicted of second-degree murder and related crimes. In the penalty phase of Appellant's trial, the jury found three aggravating circumstances: 1) the victim was a law enforcement officer killed in the performance of her duties; 2) the killing was committed during the perpetration of a felony; and 3) Appellant knowingly created a grave risk

3. Respectively, 18 Pa.C.S. §§ 2502(a), 3701, 903(a), 2702, 3502(a), and 907.

of death to another person.[4] In addition, the jury found two mitigating circumstances: 1) Appellant had no significant criminal history; and 2) other mitigating character evidence.[5] Determining that the aggravating circumstances outweighed the mitigating circumstances, the jury returned a verdict of death. On March 3, 1997, the trial court formally imposed the sentence of death and additionally imposed a sentence of not less than 32½ years and not more than 65 years of incarceration for the other offenses. This Court affirmed Appellant's judgment of sentence on January 20, 2005. *Roney, supra.*

On January 6, 2006, Appellant filed a timely *pro se* PCRA petition; counsel was appointed and filed an amended petition on November 1, 2006. However, upon Appellant's request, and before the Commonwealth could respond, attorneys from the Federal Community Defender Office for the Eastern District of Pennsylvania ("Federal Defenders") entered their appearance. *See* PCRA Court Opinion, dated 4/20/09,[6] at 1; *see also* Notes of Testimony ("N.T."), 3/1/07, at 3–5. The court formally appointed the Federal Defenders as counsel for Appellant on April 25, 2007, and they filed a supplemental amended PCRA petition on December 3, 2007. The parties agreed that many of Appellant's issues did not require a hearing; and the PCRA court determined that, of the remaining issues, only the issue of ineffectiveness of trial counsel for failing to investigate mitigating evidence required an evidentiary hearing.[7] PCRA Court Opinion at 2; N.T., 12/8/08, at 21.

The PCRA court conducted a hearing concerning this single issue from March 3–5, 2009, with argument on March 10, 2009.

**4.** Respectively, 42 Pa.C.S. §§ 9711(d)(1), (d)(6), and (d)(7).

**5.** Respectively, 42 Pa.C.S. §§ 9711(e)(1), (e)(8).

**6.** Throughout this opinion we use the term "PCRA Court Opinion" to refer to the PCRA Court's opinion of April 20, 2009.

**7.** The parties stipulated that the following issues raised on collateral review would not require a hearing:

Challenge to the grave risk [aggravating factor;] ... the *Kloiber* instruction argument[;] ... the *Simmons* claim, failure to give [the jury] a life without parole instruction[;] ... the victim impact argument[;] ... the prosecutorial misconduct penalty phase opening and

Following its issuance of a notice of intention to dismiss Appellant's PCRA claims pursuant to Pa.R.Crim.P. 909,[8] the PCRA court denied Appellant's petition in a 74–page opinion filed on April 20, 2009. In the interim, *i.e.*, on April 17, 2009, Appellant filed a motion to supplement his petition based on allegedly newly discovered evidence, to wit, a report on forensic evidence by the National Academy of Sciences. The PCRA court denied this additional claim in a supplemental opinion dated April 29, 2009. This appeal followed.[9]

Appellant has raised nine issues, most of which include sub-issues and allegations of ineffective assistance of counsel. Although we have reordered Appellant's issues for ease of discussion, they are reproduced verbatim below:

I. Did the PCRA Court Err by Denying Appellant's Claim that Trial Counsel Was Ineffective During Guilt Phase for Failing to Investigate and Present the Readily Available, Significant Evidence Casting Reasonable Doubt on the Reliability of the Commonwealth's Case?

II. Did the PCRA Court Err by Denying Appellant's Claim That the Commonwealth Violated His Rights under *Brady V* [v]. *Maryland* by Failing to Disclose Information Material to His Ability to Present a Defense at Trial; Were Prior Counsel Ineffective?

closing[;] ... a *voir dire* challenge[,] improper exclusion; ... the group *voir dire* and failure to life qualify[;] ... the racial discrimination argument[;] ... the challenge to the nonstatutory aggravating victim impact testimony, closing, and the jury instruction argument[;] ... the police officers in the courtroom[; and] ... the *Bruton* issue[,] prosecutorial misconduct *Bruton* issue.
N.T., 12/8/08, at 5–8.
However, the Federal Defenders noted their objection to the PCRA court's decision that a hearing was not necessary with regard to Appellant's *Batson* claim. *Id.* at 20.

8. Under Pa.R.Crim.P. 909(B)(2), the PCRA court may dismiss a petition without a hearing if it is satisfied "that there are no genuine issues concerning any material fact, the defendant is not entitled to post-conviction collateral relief, and no legitimate purpose would be served by any further proceedings[.]"

9. As this Court directly reviews the denial of post-conviction relief in death penalty cases pursuant to 42 Pa.C.S. § 9546(d), we have jurisdiction over the appeal.

III. Did the Commonwealth violate Due Process by Presenting False and Misleading Evidence Regarding the Surveillance Video and Film, and by Failing to Disclose the Fact, Results of Alterations And/or Enhancements to the Original Materials; Did the Lower Court Err by Denying Discovery?

IV. Was Appellant's Right to Due Process Violated When the Commonwealth Knowingly Presented False and Misleading Rebuttal Testimony and Withheld Exculpatory Evidence; Did the Lower Court Err by Denying Related Discovery?

V. Did the Commonwealth Violate Due Process by Failing to Provide the Defense with Mandatory Discovery and Exculpatory Material; Did the Lower Court Err by Denying Related Discovery?

VI. Did the Prosecutor Violate Appellant's Right to Confrontation and Due Process in Argument and by Purposely Eliciting Evidence That Informed the Jury That a Non–Testifying Co-defendant Had Told Police That Appellant Shot Officer Vaird; Were Prior Counsel Ineffective?

VII. Did the Prosecutor Use His Peremptory Challenges in Discriminatory Manner Against African Americans and Women; Were Prior Counsel Ineffective?

VIII. Was Trial Counsel Was Ineffective at the Capital Sentencing Phase for Failing to Investigate, Develop and Present Significant Mitigating Evidence Related to Appellant's Traumatic Childhood, Substance Abuse, and Psychological Impairments?

IX. Was the Evidence Legally Insufficient to Establish the Grave Risk Aggravator, As Defined and Limited by this Court? Alternatively, Was that Aggravating Circumstance Unduly Vague and Overbroad as Applied to Appellant, Particularly in Light of the Absence of Adequate Limiting Instructions; Were Prior Counsel Ineffective?

Appellant's Brief at 2.

Before addressing the issues raised by Appellant, we set forth some general principles relevant to our review. In

16

reviewing the denial of PCRA relief, we examine whether the PCRA court's determinations are supported by the record and are free of legal error. *Commonwealth v. Spotz*, 610 Pa. 17, 18 A.3d 244, 259 (2011). The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions. *Id.* We review a PCRA court's denial of an appellant's request for discovery for abuse of discretion. *Commonwealth v. Bryant*, 579 Pa. 119, 855 A.2d 726, 749–50 (2004).

In order to obtain collateral relief, a petitioner must establish by a preponderance of the evidence that his or her conviction or sentence resulted from one or more of the circumstances enumerated in 42 Pa.C.S. § 9543(a)(2). These circumstances include a violation of the Pennsylvania or United States Constitution or ineffectiveness of counsel, either of which "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(i) and (ii). In addition, a petitioner must show that the claims of error have not been previously litigated or waived. 42 Pa.C.S. § 9543(a)(3). An issue has been previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." 42 Pa.C.S. § 9544(a)(2). An issue has been waived "if the petitioner could have raised it but failed to do so before trial, at trial, on appeal or in a prior state post[-]conviction proceeding." 42 Pa.C.S. § 9544(b).

In most of Appellant's issues, he has alleged ineffective assistance of counsel.[10] Counsel is presumed effective, and the

10. This case was pending on direct appeal at the time we decided *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002). In *Grant*, this Court held that claims of ineffectiveness of trial counsel should be deferred until collateral review. *See, e.g., Commonwealth v. Hanible*, 612 Pa. 183, 30 A.3d 426, 439 (2011). We applied *Grant* retroactively to all cases pending on direct appeal where an ineffectiveness claim had been properly raised and preserved. *See Commonwealth v. Roney*, 581 Pa. 587, 866 A.2d 351, 357 (2005). In Appellant's direct appeal, he raised numerous claims of ineffectiveness of trial counsel, which we

petitioner bears the burden of proving otherwise. *Commonwealth v. Hanible*, 612 Pa. 183, 30 A.3d 426, 439 (2011). To prevail on an ineffectiveness claim, the petitioner must plead and prove, by a preponderance of the evidence, the following three elements: (1) the underlying claim has arguable merit; (2) counsel had no reasonable basis for his or her action or inaction; and (3) the petitioner suffered prejudice as a result of counsel's action or inaction. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987) (clarifying that the standard for analyzing ineffective assistance of counsel claims in Pennsylvania is the same as the federal standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)); *see Spotz, supra* at 260 (applying the *Strickland/Pierce* standard). With regard to the second, reasonable basis element, "we do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis." *Hanible, supra* at 439 (citation omitted). We will conclude that counsel's strategy lacked a reasonable basis only if the petitioner proves that a foregone alternative "offered a potential for success substantially greater than the course actually pursued." *Spotz, supra* at 260 (citation omitted). To establish the third, the prejudice element, the petitioner must show that there is a reasonable probability that the outcome of the proceedings would have been different but for counsel's action or inaction. *Id.* Counsel will not be found ineffective for failing to raise a meritless claim. *Commonwealth v. Washington*, 592 Pa. 698, 927 A.2d 586, 603 (2007).

 The PCRA court has the discretion to dismiss a petition without a hearing when the court is satisfied "that there are no genuine issues concerning any material fact, the defendant is not entitled to post-conviction collateral relief, and no legitimate purpose would be served by further proceedings." *Commonwealth v. Paddy*, 609 Pa. 272, 15 A.3d 431, 442 (2011) (quoting Pa.R.Crim.P. 909(B)(2)). "To obtain

declined to address with no prejudice to Appellant's right to raise them on collateral review. *Id.* at 356 n. 31 and 357.

18

reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing." *Id.* (quoting *Commonwealth v. D'Amato*, 579 Pa. 490, 856 A.2d 806, 820 (2004)). We stress that an evidentiary hearing "is not meant to function as a fishing expedition for any possible evidence that may support some speculative claim of ineffectiveness." *Commonwealth v. Jones*, 571 Pa. 112, 811 A.2d 994, 1003 n. 8 (2002) (citation omitted). In *Jones*, we declined to remand for an evidentiary hearing when the appellant merely asserted that counsel did not have a reasonable basis for his lack of action but made no proffer of evidence as to counsel's lack of action.

We turn now to the issues raised by Appellant.

## 1. Evidence that another man, Travis Hall, killed Officer Vaird

■ In his first issue, Appellant asserts that trial counsel provided ineffective assistance because he failed to recognize, investigate, and present available evidence suggesting that a man named Travis Hall participated in the robbery of the PNC Bank and was the co-perpetrator who shot Officer Vaird. At trial, Appellant offered a defense of misidentification and alibi.[11] In his PCRA petition and before this Court, Appellant asserts that evidence of Hall's involvement in the PNC Bank robbery and of his prior armed robberies of other establishments would have been admissible at trial and would have undermined the Commonwealth's case against Appellant.

To support his claim that trial counsel was ineffective for failing to recognize, investigate, and present this evidence, Appellant avers the following. Hall not only was an initial suspect in the robbery/murder, but also eventually admitted that he had stolen and given to McGlone the get-away van in exchange for a percentage of the robbery proceeds. Around the time of the robbery/murder, Hall committed numerous

11. Both Appellant and his mother testified that he was at her home at the time of the robbery/murder. *See* N.T., 10/28/96, at 20, 37.

armed robberies of business establishments in the Philadelphia area, which were allegedly similar to the PNC Bank robbery, and thus, Appellant asserts, would have constituted admissible evidence at trial. Appellant and Hall share a certain physical resemblance in that each is tall, approximately 6'5". Furthermore, Mohammad Chuchtai, a witness who was standing across the street from the bank at the time of the robbery/murder, identified Hall as the individual he saw running from the bank when he was shown an array of five photographs by PCRA counsel. Importantly, this photo-identification took place more than eleven years after the robbery/murder. Finally, Appellant argues that the Commonwealth's case was "far from insurmountable" as there was no physical evidence linking him to the crime and the eyewitness testimony was inconsistent, uncertain, and unreliable. Appellant's Brief at 28–32.

In holding that this ineffective assistance claim was without merit, the PCRA court concluded that trial counsel's strategy in not attempting to blame the murder on Hall was reasonable and that Appellant had not shown he was prejudiced. PCRA Court Opinion at 2. The PCRA court also noted that, at trial, three eyewitnesses had identified Appellant as the perpetrator. *Id.* at 4. With regard to Mr. Chuchtai's photo array identification of Hall eleven years after the crime, the PCRA court concluded that this identification was "less credible" than the three eyewitness identifications of Appellant at trial. *Id.* at 5. In addition, the PCRA court determined that Hall's admitted involvement in securing the get-away van "does not change the evidence which clearly and unequivocally points to [Appellant] as the murderer of Officer Vaird." *Id.* at 7.

Finally, the PCRA court rejected Appellant's assertion that evidence of Hall's prior armed robberies would have been admissible to show that it was Hall who had murdered Officer Vaird, relying on this Court's opinion in *Commonwealth v. Bryant,* 515 Pa. 473, 530 A.2d 83 (1987), wherein we reiterated the following principles.

Evidence of other crimes is admissible when it tends to prove a common scheme, plan or design embracing the

commission of two or more crimes so related to each other that proof of·one tends to prove the others or to establish the identity of the person charged with the commission of the crime on trial,—in other words where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other.

... this Court has often cited McCormick, Evidence, § 190 (1972 2d ed.), wherein evidence of other crimes is said to be admissible [to] "prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused. Here much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual and distinctive as to be like a signature."

*Id.* at 85 (internal citations and emphasis omitted) (cited and quoted in part in PCRA Court Opinion at 7).

Based on the above principles, the PCRA court held that evidence of Hall's other robberies did not come close to meeting the standard for admissibility as a common scheme, plan, or design. To support his assertion to the contrary, Appellant averred that Hall (1) committed numerous armed robberies, some involving financial establishments, within the same time frame and within a similar geographical area as the PNC Bank robbery; (2) fired his gun during some of the robberies; (3) was aided by accomplices during the robberies; and (4) stole get-away vehicles for use in the robberies. However, the PCRA court determined that none of Hall's robberies had occurred at a bank; rather, his robberies had involved various entities, including a check cashing store, a restaurant, and armored trucks; that Hall had never killed anyone in the course of his robberies; and that the robberies had been in the Philadelphia area generally, not in a specific area of the city. PCRA Court Opinion at 8–9. The PCRA court concluded that Hall's robberies exhibited "no unique facts" that would "amount to a signature or [would] earmark the crimes as 'the handiwork' of Hall." *Id.* at 8. Rather, the

PCRA court concluded, "[t]he robberies committed by Mr. Hall, sadly but realistically, reflect the type of violent crimes involving stolen vehicles, disguises, and firearms that occur so prevalently in modern day America." *Id.*

The PCRA court's determinations and conclusions summarized above are all supported by the record and free of legal error. Accordingly, we will not disturb them.

Furthermore, as the Commonwealth emphasizes, we note that Appellant has offered no affidavit or other evidence as to what trial counsel did or did not investigate, or what information trial counsel did or did not have, regarding Hall's role in the robbery/murder. At a hearing on December 8, 2008, PCRA counsel acknowledged that they had talked to Appellant's trial counsel and were "in the process of working out an affidavit" from him concerning this issue. N.T., 12/8/08, at 16. However, no affidavit from counsel is included in the record, and Appellant has offered no explanation for its absence. In fact, Appellant proffers no evidence whatsoever as to what actions trial counsel took or failed to take relative to Hall and his involvement in the robbery/murder. Thus, Appellant's assertion that trial counsel failed to recognize or investigate Hall's involvement in the robbery/murder is pure speculation. Equally speculative is Appellant's assertion that trial counsel had no reasonable basis for not presenting evidence of Hall's involvement in the robbery/murder during Appellant's trial. *See Commonwealth v. Marshall,* 571 Pa. 289, 812 A.2d 539, 548 (2002) (concluding that the appellant had failed to establish the reasonable basis prong of his claim of ineffectiveness of counsel for failing to investigate and present mental health mitigating evidence because, *inter alia,* the appellant did not proffer affidavits from his trial counsel concerning their actual investigations prior to the penalty-phase hearing, and did not provide an explanation as to why such affidavits could not be procured). Appellant's claim that trial counsel failed to investigate Hall's role in the robbery/murder is based on nothing more than speculation, devoid of any factual evidentiary support, and thus must fail.

In sum, Appellant's first issue, in which he asserts that trial counsel was ineffective for not recognizing, not investigating, and not presenting evidence that it was Travis Hall who allegedly shot Officer Vaird, fails for all the reasons set forth by the PCRA court, as summarized above, and also because the claim is based purely on speculation as to what trial counsel did or did not do, and did or did not recognize, with regard to Hall's involvement in the robbery/murder.

## 2. *Brady* Claim Regarding Travis Hall Prosecution

In his second issue, Appellant claims that the Commonwealth violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose information related to the investigation and prosecution of Travis Hall for numerous serious offenses, including the robbery/murder in this case. Before addressing Appellant's specific *Brady* claim, we consider the relevant legal principles.

 Under *Brady* and subsequent decisional law, a prosecutor has an obligation to disclose all exculpatory information material to the guilt or punishment of an accused, including evidence of an impeachment nature. *See, e.g., Commonwealth v. Hutchinson*, 611 Pa. 280, 25 A.3d 277, 310 (2011). To establish a *Brady* violation, an appellant must prove three elements:

(1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; (2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice ensued.

*Hutchinson, supra* (citation omitted).

 The burden rests with the appellant to "prove, by reference to the record, that evidence was withheld or suppressed by the prosecution." *Id.* (citation omitted). The evidence at issue must have been "material evidence that deprived the defendant of a fair trial." *Id.* (citation and emphasis omitted). "Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the ev-

idence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Commonwealth v. Paddy*, 609 Pa. 272, 15 A.3d 431, 450 (2011) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).

*Brady* does not require the disclosure of information "that is not exculpatory but might merely form the groundwork for possible arguments or defenses," nor does *Brady* require the prosecution to disclose "every fruitless lead" considered during a criminal investigation. *Id.* (citation omitted). The duty to disclose is limited to information in the possession of the government bringing the prosecution, and the duty **does** extend to exculpatory evidence in the files of police agencies of the government bringing the prosecution. *Commonwealth v. Puksar*, 597 Pa. 240, 951 A.2d 267, 283 (2008); *Commonwealth v. Lesko*, 609 Pa. 128, 15 A.3d 345, 370 (2011) (applying *Kyles, supra* at 438, 115 S.Ct. 1555). *Brady* is not violated when the appellant knew or, with reasonable diligence, could have uncovered the evidence in question, or when the evidence was available to the defense from other sources. *Commonwealth v. Smith*, 609 Pa. 605, 17 A.3d 873, 902–03 (2011); *Paddy, supra* at 451.

*Brady* sets forth a limited duty, not a general rule of discovery for criminal cases. *Paddy, supra* at 451 (citing *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977) for the proposition that "there is no generalized constitutional right to discovery in a criminal case, and *Brady* did not create one").

Here, Appellant's *Brady* claim focuses on the Commonwealth's interactions with Travis Hall. Appellant acknowledges that the Commonwealth **did** provide defense counsel with Hall's statement to police, taken on September 12, 1996, in which Hall admitted stealing the van used by Appellant and his co-defendants as a get-away vehicle; admitted that he expected 10% of the robbery proceeds in exchange for providing the get-away vehicle; identified the three perpetrators in

the PNC Bank robbery as McGlone, Canty, and Appellant; and admitted that he had fled from the state when he learned that police were looking for him in connection with the robbery/murder. Appellant's Brief at 35; Investigation Interview Record of Travis Hall, dated 9/12/96, (Defense PCRA Exhibit 4); N.T. Pretrial Suppression Hearing, 10/1/96, at 18. However, Appellant contends that the Commonwealth did not reveal to him the following:

The Commonwealth did *not* reveal to Appellant the circumstances surrounding [Hall's] statement [to police]: Hall, an unindicted co-conspirator was providing 'substantial' assistance and, it is reasonable to infer, therefore was not charged in this case. And [the Commonwealth] did not reveal to the defense the many armed robberies which Hall admitted to in those federal proceedings, or the deal he received for cooperating.

*　　*　　*　　*　　*　　*

[T]he Commonwealth has never disclosed the nature of Hall's assistance; the reasons why he did not face charges in a case where a Philadelphia police officer was killed; the evidence in possession of the Commonwealth linking Hall to this case; any physical and documentary evidence seized from Hall linking him to this case; and the nature of his deal with the Commonwealth that allowed him to serve a very short prison term in relation to the numerous offenses he admitted committing, including kidnapping, murder and armed robbery in return for his testimony in numerous state cases and in federal court.

Appellant's Brief at 35–36 (emphasis in original).

In response, the Commonwealth argues that Appellant has not carried his burden to establish that the Commonwealth withheld any evidence concerning Hall. More specifically, the Commonwealth argues that Appellant not only has failed to produce any evidence that the Commonwealth had a deal with Hall, but also has proffered no evidence that Hall provided any information whatsoever in the investigation of the PNC Bank robbery/Vaird murder, other than giving the above-

referenced—and disclosed—statement to police on September 12, 1996, which was eight months after the offense and a few weeks before trial. Commonwealth's Brief at 21–22. With regard to the Commonwealth's failure to prosecute Hall for the robbery/murder, the Commonwealth points out that Hall faced serious federal consequences for his involvement in this case. Specifically, in the course of Hall's guilty plea in federal court to an unrelated robbery, Hall also admitted involvement in numerous other robberies, including supplying the stolen get-away van used in the PNC Bank robbery/Vaird murder. Government's Plea Memorandum, *U.S. v. Hall,* dated 10/8/96, at 6 (III(e)h) (Defense PCRA Exhibit 5). Pursuant to this federal plea agreement, "these additional offenses shall be treated as if [Hall] had been convicted of additional counts charging these offenses" for purposes of determining his Sentencing Guidelines range. *Id.* at 4; *see also* Guilty Plea Agreement, *U.S. v. Hall,* dated 10/7/96, at 9 (Defense PCRA Exhibit 8). The Commonwealth avers that the facts of Hall's federal guilty plea were available to Appellant prior to his trial. Commonwealth's Brief at 24.

We must note first that all of the *Brady* violations Appellant alleges in this issue could have been raised at trial and/or on direct appeal. Appellant makes no attempt to argue to the contrary, he does not explain why prior counsel could not have uncovered the alleged violations with reasonable diligence, and he provides no indication as to when or how he first became aware of the alleged *Brady* violations. Accordingly, this issue is waived. *See Commonwealth v. Chmiel,* 612 Pa. 333, 30 A.3d 1111, 1129–30 (2011) (concluding that the appellant's *Brady* claim concerning an alleged deal between the prosecutor and two material witnesses was waived for failure to have raised it in an earlier proceeding). In the argument section for this issue, *see* Appellant's Brief at 34–37, Appellant does **not** contend that trial counsel and/or appellate counsel were ineffective for failing to raise the alleged *Brady* violations. Appellant mentions ineffectiveness of counsel in the context of this issue **only** in his Statement of Questions Involved, where at the end of his statement of Issue 2 he adds

the phrase "Were Prior Counsel Ineffective?". *Id.* at 2 (quoted in text, *supra* ). Appellant has thus failed to develop an ineffective assistance of counsel claim in this issue, and hence any such claim is also waived.

Nonetheless, the PCRA court rejected Appellant's *Brady* claim on the merits. In denying relief, the PCRA court agreed with the Commonwealth that Appellant had failed to establish that the Commonwealth had withheld any evidence with respect to Hall. PCRA Court Opinion at 44. The PCRA court found that the Commonwealth had provided to defense counsel all the information that it had with respect to Hall's involvement in the PNC Bank robbery/Vaird murder in the early part of the investigation, and then, on October 1, 1996, disclosed Hall's September 12, 1996 statement to police. *Id.* (citing N.T., 10/1/96, at 18). In addition, the PCRA court determined that Appellant had failed to show that Hall had provided any "substantial assistance" to the Commonwealth. *Id.* at 45.

With regard to Hall's interaction with federal prosecutors, the PCRA court made additional findings. The PCRA court credited the assistant district attorney's statement that the Commonwealth was "not in possession of any documentation as to any deals made [with Hall] by the Federal Government." *Id.* (citing N.T., 10/1/96, at 18). Furthermore, the PCRA court recognized that the Commonwealth's *Brady* obligation does not extend to information that is not in its possession, but rather is in the possession of the federal government, a different governing authority. *Id.; see Puksar, supra.* The PCRA court determined that the Commonwealth and the defense had equal access to materials concerning Hall that were in the possession of the federal government. PCRA Court Opinion at 45. In addition, as determined by the PCRA court, "Hall was not promised a specific sentence from the District Attorney's Office for his pleading guilty and cooperating in federal court, nor was he promised a lenient sentence." *Id.* (citing Guilty Plea Agreement, *U.S. v. Hall,* dated 10/7/96, at 1–5 (Defense PCRA Exhibit 8)).

Finally, the PCRA court concluded that Appellant had failed to prove that any of the alleged evidence he sought was favorable or material to his defense. *Id.* We have reviewed the record, and we conclude that the PCRA court's findings are supported by the record and its legal conclusions are free of error.

On a more fundamental level, we emphasize that Appellant's assertions that the Commonwealth withheld information as to Hall's role in the PNC Bank robbery/Vaird murder, as to Hall's alleged assistance to the Commonwealth, and as to an alleged deal between Hall and the Commonwealth are based purely on speculation, not on any evidence. The PCRA court found that the Commonwealth had disclosed all the information in its possession concerning Hall's involvement in the PNC Bank robbery/Vaird murder, and Appellant provides absolutely no evidence to the contrary. Furthermore, Appellant sets forth not a single specific example of the assistance that he alleges Hall provided to the Commonwealth. The only evidence that Appellant proffers as to a "deal" between Hall and the Commonwealth is the plea agreement that Hall entered—**not** with the Commonwealth—but with the Office of the United States Attorney for the Eastern District of Pennsylvania. *See* Guilty Plea Agreement, *U.S. v. Hall,* dated 10/7/96 (Defense PCRA Exhibit 8); Government's Plea Memorandum, U.S. *v. Hall,* dated 10/8/96 (Defense PCRA Exhibit 5). Pursuant to this Guilty Plea Agreement, Hall stipulated to his participation in numerous robberies and other offenses and agreed to cooperate with the "government," which is explicitly defined in the Agreement as the Office of the United States Attorney for the Eastern District of Pennsylvania. Guilty Plea Agreement, *U.S. v. Hall,* dated 10/7/96 (Defense PCRA Exhibit 8, at 1). If Hall cooperated, the United States Attorney agreed to make a motion to allow the District Court to depart from federal sentencing guidelines and impose a sentence below the mandatory minimum. *Id.* at 4. This federal plea agreement pertains to Hall's federal crimes prosecuted in federal court, and it lends no support to Appellant's bald

28

assertion that Hall had entered into some kind of deal with the Commonwealth of Pennsylvania.

In sum, Appellant's claim of a *Brady* violation in Issue 2 has been waived, but even if we were to review the claim on the merits, as the PCRA court did, the claim would fail because it is based on purely speculative assertions. Appellant is entitled to no relief on his second issue.[12]

### 3. *Brady* Claim Regarding Bank Surveillance Videotape

In his third issue, Appellant claims that the Commonwealth presented false and misleading photographic and video evidence derived from the PNC Bank's surveillance camera system which had recorded portions of the robbery on videotape. More specifically, Appellant asserts that the original videotape was altered or enhanced by the FBI and/or by a camera shop, and that the chain of custody of the original videotape was suspect. In Appellant's view, the Commonwealth violated *Brady, supra*, by failing to disclose fully the processing of and alleged alterations to the videotape. Finally, Appellant asserts that trial counsel was ineffective for failing to investigate and uncover these alleged problems with the videotape evidence. *See* Appellant's Brief at 47–51.

As the Commonwealth points out, *see* Commonwealth's Brief at 38, the claims in this issue have been waived for failure to present them to the PCRA court. *See* Pa.R.App.P.

12. In the last sentence of his argument for Issue 2, Appellant seeks broad discovery, pursuant to Pa.R.Crim.P. 902(E)(2), concerning the following matters: "the original surveillance videotape and film, and evidence derived from them; chemical or criminalistics analyses and reports; ballistics examinations; discovery related to testimony and statement of police officer Richard Williams; any and all payments made by the Philadelphia District Attorney's Office to witnesses in Appellant's case; and the Philadelphia police investigation file related to this case and Travis Hall." Appellant's Brief at 37. These requests constitute the entirety of the sub-claim. Appellant provides no specifics, no argument, no rationale, no development, no citations to supporting authority. We will not formulate Appellant's claims or arguments. This portion of Issue 2 is not reviewable, and it is waived for utter lack of development. *See, e.g., Commonwealth v. Spotz*, 610 Pa. 17, 18 A.3d 244, 281 n. 21, 326 (2011); *Commonwealth v. Paddy*, 609 Pa. 272, 15 A.3d 431, 458 (2011).

302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); *Spotz*, 18 A.3d at 275 n. 17 (concluding that the appellant's *Brady* claim was waived for failure to have presented it to the PCRA court). Our review of the certified record reveals no indication that Appellant presented this issue to the PCRA court in a timely manner, and he has failed to direct us to any portion of the record that would show otherwise.[13]

In an apparent attempt to avoid waiver of this issue, Appellant makes the bald—and incorrect—statement that the claims set forth above were "appropriately" raised under the PCRA because "*Brady* error overcomes 'waiver.' " Appellant's Brief at 48. Notwithstanding Appellant's assertion to the contrary, it is well-established by precedent from this Court that *Brady* claims most certainly **can** be waived. *See, e.g., Commonwealth v. Chmiel,* 612 Pa. 333, 30 A.3d 1111, 1129 (2011) (holding that the *Brady* claims raised by the appellant under the PCRA were waived for failure to have raised them at trial or on direct appeal); *Spotz,* 18 A.3d at 275 n. 17 (holding that the appellant waived his *Brady* claim by not presenting it to the PCRA court, but raising it for the first time on appeal of the PCRA court's order); *Commonwealth v. Ligons,* 601 Pa. 103, 971 A.2d 1125, 1146–47 (2009) (stating that the appellant's assertion that a *Brady* claim cannot be waived is inconsistent with the case law of this Court).[14, 15]

13. We do not know, and Appellant does not indicate, whether he raised this issue in his February 26, 2009 filing of additional supplemental amendments. This document, although listed on the docket, is not included in the certified record. As we discuss in the text *infra, see* Issue 4, the PCRA court did not grant Appellant leave to amend his PCRA petition via this filing, did not address the claims raised by Appellant in this filing, and did not implicitly or explicitly accept this filing as an amendment to Appellant's PCRA petition. Thus, even if Appellant did raise this issue in his February 26, 2009 filing of additional supplemental amendments, it would be of no moment to our disposition of this issue. *See* Issue 4, *infra.*

14. Appellant cites only *Commonwealth v. Strong,* 563 Pa. 455, 761 A.2d 1167 (2000), to support his assertion that *Brady* claims cannot be waived. As we have explicitly stated, *Strong* lends no support to the assertion that *Brady* claims cannot be waived. *See Ligons,* 971 A.2d at

Although Appellant has waived this issue by his failure to have raised it before the PCRA court, we recognize that Appellant also filed a motion for discovery in the PCRA court, in which he requested discovery of materials related to this issue. Motion for Discovery, dated 12/8/08, ¶¶ 20–29; see Appellant's Brief at 51. Specifically, Appellant sought the original videotapes and original photographs derived from them as well as other materials. *Id.* In denying Appellant's motion for discovery, the PCRA court determined that Appellant merely sought to "assess the accuracy of the Commonwealth's trial evidence" based on the videotapes. PCRA Court Opinion at ¶ 157. The PCRA court held that Appellant

1146–47 (rejecting the appellant's reliance on *Strong* to support his assertion that *Brady* claims cannot be waived).

15. Although we decide this issue on the basis of waiver for failure to have presented the issue to the PCRA court, we are compelled to note the following. In a one-sentence claim, Appellant baldly asserts that trial counsel was ineffective for failing to investigate, uncover, and request disclosure of information related to alleged alterations in the videotape and to the Commonwealth's allegedly false and misleading evidence regarding the videotape. Appellant's Brief at 48. Appellant fails to mention—much less develop a reasoned argument based upon—the standard by which claims of ineffectiveness are evaluated. Furthermore, Appellant's bald claim of trial counsel ineffectiveness is entirely speculative because Appellant presents not a bit of evidence as to what counsel actually did or failed to do with respect to the videotape evidence.

We also note that Appellant has presented no evidence to support his assertion that the Commonwealth presented false and misleading evidence in the form of altered or enhanced videotape images. Appellant asserts that the videotape was sent to the FBI, "information that came to light during PCRA proceedings," apparently when the Commonwealth provided a copy of the videotape to PCRA counsel. Appellant's Brief at 48–49. This does not constitute evidence that the FBI in any way enhanced, altered, or tampered with the videotape. *Id.* at 49–50. As we have discussed in Issue 2, see text *supra*, federal prosecutors entered into a plea agreement with Travis Hall for his participation in, *inter alia*, the PNC Bank robbery/Vaird murder.

In addition, as Appellant acknowledges, although "[p]arts of the incident were captured by security cameras, [ ] the shooting was not recorded and no identifications were made from the surveillance film." Appellant's Brief at 6. Thus, by Appellant's own admission, the videotape did not incriminate him as he was not identified as the shooter or even as one of the bank robbers from the videotape. Appellant does not begin to suggest how the purely speculative alleged enhancements or alterations could have supported or strengthened the Commonwealth's case and prejudiced him.

had not established good cause for further discovery of these items because he already had copies of the relevant materials. *Id.*

Appellant asserts here that the PCRA court erred by denying discovery. Appellant's Brief at 51. From our review of the record, we conclude that the PCRA court did not abuse its discretion in denying further discovery related to the videotape. Appellant's entirely speculative and unsupported assertions that the Commonwealth altered or enhanced the videotape in ways undisclosed to Appellant do not constitute good cause for further discovery. *See infra* n. 20.

Appellant is not entitled to any relief on Issue 3.

## 4. *Brady* Claim Regarding Presentation of Allegedly False and Misleading Testimony

In Issue 4, Appellant claims that his due process rights were violated when the Commonwealth presented the allegedly false trial testimony of Officer Richard Williams and, in violation of *Brady, supra,* withheld exculpatory evidence relevant to this testimony. The background to this claim is as follows.

On May 3, 1995, eight months before the murder of Officer Vaird, Officer Williams stopped a car driven by Appellant with two male passengers, one in the front seat and another, who had sustained a gunshot wound to the leg, in the rear seat. Based on his observation of a gun on the driver's side of the car, Officer Williams arrested Appellant on a firearms possession charge. Subsequently, at Appellant's murder trial, Officer Williams testified that on May 3, 1995, he had stopped a car driven by Appellant with Canty and McGlone in the front and rear passenger seats, respectively. N.T., 10/28/96, at 109–10. The Commonwealth proffered this testimony to impeach Appellant, who, under cross-examination, had previously testified that he had never been in a car with Canty and McGlone. *Id.* at 57.

Appellant now asserts that Officer Williams's identification of Canty and McGlone as the two men in the car with

Appellant on May 3, 1995, constituted false testimony, and that the Commonwealth withheld exculpatory evidence, in violation of *Brady, supra*, with which Officer Williams could have been impeached. Appellant's Brief at 44–47. To support these assertions, Appellant provides declarations from two men, Richard Keith Ennis and Daniel Hunter, in which they assert that they were the passengers in Appellant's car on May 3, 1995, when it was stopped by Officer Williams. *Id.* at 45–46 & n. 14; Declarations of Richard Keith Ennis, dated 5/10/08, and Dan Hunter, dated 6/26/07 (Appendix to Appellant's Brief at 38 and 32, respectively). In addition, Appellant provides hospital records to show that one Keith Ennis had been treated for a gunshot wound to the thigh on May 3, 1995. Appendix to Appellant's Brief at 37. Appellant also finds significance in the fact that Appellant's passengers on May 3, 1995, had not been previously identified, either in the police paperwork provided in discovery regarding Appellant's arrest on firearms charges that day, or during Officer Williams' testimony at Appellant's trial on the firearms charges which had taken place on November 27, 1995. *Id.* at 35. Appellant contends that Officer Williams did not identify Appellant's passengers as Canty and McGlone until he was interviewed in the District Attorney's Office on April 25, 1996. Appellant's Brief at 45–45 & n. 13, 14; Investigation Interview Record of Officer Williams, dated 4/25/96 (Appendix to Appellant's Brief at 36). Finally, Appellant asserts that the Commonwealth failed to disclose evidence in the form of "investigative reports" showing that Officer Williams knew that Appellant's passengers on May 3, 1995, had been Ennis and Hunter, not Canty and McGlone. Appellant's Brief at 47; Appellant's Reply Brief at 9–10.

In response, the Commonwealth argues that this issue is waived because it was filed in an untimely manner, without the PCRA court's permission. Commonwealth's Brief at 35 & n. 6. The Commonwealth avers that Appellant first raised this issue in a filing on February 26, 2009, which was more than two months after the December 8, 2008 hearing where the PCRA court determined which of Appellant's numerous PCRA

issues required an evidentiary hearing. *Id.* at 35 n. 6. Furthermore, the Commonwealth argues that, even if these claims are reviewable, they are meritless for several reasons: Appellant has not established that Officer Williams testified falsely. Appellant surely knew the identity of the passengers in the car with him, one of whom had been shot, when he was arrested on the firearms possession charges, so this information is not *Brady* material because it was readily available to the defense. Furthermore, hospital records, equally available to the defense and the prosecution, are not *Brady* material. Commonwealth's Brief at 36 (citing *Commonwealth v. Smith*, 609 Pa. 605, 17 A.3d 873, 902–03 (2011), and *Commonwealth v. Miller*, 560 Pa. 500, 746 A.2d 592, 600 (2000), for the proposition that the Commonwealth does not violate *Brady* by failing to produce documents, including hospital records, equally available to the defense).

To understand the PCRA court's resolution of this issue and our disposition, it is necessary to review briefly the procedural history of Appellant's filings in this case. On January 6, 2006, Appellant filed a timely *pro se* PCRA petition. On November 1, 2006, Appellant's initial PCRA counsel filed an amended PCRA petition. On December 3, 2007, the Federal Defenders, Appellant's current counsel, filed a supplemental amended PCRA petition raising numerous guilt-phase and penalty-phase issues. After holding a hearing on December 8, 2008, the PCRA court concluded that an evidentiary hearing was required only on the issue of trial counsel's investigation and presentation of mitigating evidence during the penalty phase of trial.[16]

However, also on December 8, 2008, Appellant filed a wide-ranging discovery motion seeking numerous documents primarily related to the guilt phase of trial. In one section of Appellant's December 8, 2008 discovery motion, he sought discovery relating to Officer Williams's April 25, 1996 statement and his trial testimony. Specifically, Appellant asked the Commonwealth to provide any documentation in its pos-

16. The evidentiary hearing was conducted from March 3–5 and on March 10, 2009.

34

session that would corroborate the officer's testimony at Appellant's trial that the two men in the car with Appellant during his May 3, 1995 arrest on a firearms charge were Canty and McGlone. Appellant's Motion for Discovery, dated 12/8/08, at ¶ 49. In addition, Appellant sought investigative reports of the May 3, 1995 shooting and hospital records of the gunshot victim. *Id.*

Almost three months later, in a February 26, 2009 filing entitled "Additional Supplemental Amendments to Petition for Habeas Corpus Relief," Appellant presented to the PCRA court the claims in this issue—that Officer Williams gave false testimony, that the Commonwealth knew the officer's testimony was false, and that the Commonwealth had withheld evidence with which to impeach the officer.[17] There is no indication from the record that the PCRA court granted Appellant permission to file the February 26, 2009 additional supplemental amendments.

On April 20, 2009, the PCRA court denied Appellant's PCRA petition as well as his motion for discovery. *See* PCRA Court Opinion and Order, dated 4/20/09. With regard to Officer Williams's testimony, the PCRA court reasoned and held as follows:

164. [Appellant] requests discovery related to Police Officer Williams to corroborate this officer's testimony that "he had once observed [Appellant] traveling in a car with McGlone and Canty, and McGlone had just been shot." [18] Motion for Discovery, ¶ 47–50. This material is irrelevant

17. The February 26, 2009 filing containing additional supplemental amendments to Appellant's PCRA petition, although listed on the docket, is not included in the certified record. However, the Commonwealth avers and Appellant does not disagree that the claims concerning Officer Williams' testimony were first asserted in this February 26, 2009 filing. *See* Commonwealth Brief at 35 n. 6; Appellant's Reply Brief at 9 & n. 2.

18. Officer Williams testified that, on May 3, 1995, he came into contact with Appellant, Canty, and McGlone, all of whom were present in a car driven by Appellant. Contrary to Appellant's averment in his motion for discovery, the officer did *not* testify that McGlone had been shot. N.T. Trial, 10/28/96, at 108–17; Motion for Discovery, dated 12/8/08, at 17, ¶ 47.

to the penalty phase at trial, which alone was addressed at the hearing, as it relates only to the guilt phase trial rebuttal evidence. There is no good cause to order this material to be disclosed to the defense.

\* \* \* \* \* \*

167. Based on the foregoing, defendant's discovery motion must be denied. Defense counsel filed an "Additional Supplemental Amendments to Petition for Habeas Corpus Relief" on February 26, 2009. **Defense counsel has raised an unending litany of issues and at some point this court has to adjudicate the claims before it.** In a letter to the court dated February 26, [2009], defense counsel stated, "Please note that the claims in our Additional Supplemental Amendments all relate to matters raised in our pending discovery motion. We have done this in an abundance of caution in order to avoid any potential procedural pitfalls in the future. Moreover, these issues all pertain to the guilt phase and thus do not implicate the evidentiary hearing scheduled for next week."

168. As the discovery motion was denied, any claims related to the discovery motion in the "Additional Supplemental Amendments to Petition for Habeas Corpus Relief" need not be addressed by this court.

PCRA Court Opinion at 73–74 (emphasis and footnote added).

Pursuant to our Rules of Criminal Procedure, a PCRA petitioner may amend his or her PCRA petition with leave of the court:

**Rule 905. Amendment and Withdrawal of Petition for Post–Conviction Collateral Relief.**

(A) The judge may grant leave to amend or withdraw a petition for post-conviction collateral relief at any time. Amendment shall be freely allowed to achieve substantial justice.

Pa.R.Crim.P. 905(A); *see Commonwealth v. Porter*, 613 Pa. 510, 35 A.3d 4, 12 (2012) (reiterating that Rule 905(A) "explicitly states that amendment [of a PCRA petition] is permitted **only** by direction or leave of the PCRA court") (emphasis

added); *Commonwealth v. Flanagan*, 578 Pa. 587, 854 A.2d 489, 499 (2004) ("PCRA courts are invested with discretion to permit the amendment of a pending, timely-filed post-conviction petition . . . .").

There is absolutely no indication in the record that the PCRA court granted Appellant leave to amend his PCRA petition via the filing of additional supplemental amendments on February 26, 2009, a filing that included several new issues, including the claims raised in this issue as to Officer Williams's testimony. The PCRA court addressed only generally Appellant's February 26, 2009 filing, concluding that the court had to "adjudicate the claims before it," despite the "unending litany of issues" raised by defense counsel. PCRA Court Opinion at 74. The PCRA court did not, at any time or in any filing, address or even delineate the claims raised by Appellant in his February 26, 2009 additional supplemental amendments. On this record, we conclude that the PCRA court did not grant Appellant leave to amend his PCRA petition via his February 26, 2009 filing; did not implicitly or explicitly accept the February 26, 2009 filing as an amendment to Appellant's PCRA petition; and accordingly, did not address the claims raised in the February 26, 2009 filing.[19]

**19.** Appellant argues that the PCRA court "implicitly accepted" his February 26, 2009 additional supplemental amendments, citing the following excerpt of notes of testimony from the first day of the PCRA evidentiary hearing.

*Prosecutor:* Your Honor, as to the new claims, I'm presuming that they are not going to be the subject of this hearing, that counsel will not be asked questions about the claims that were recently filed.
*Defense Counsel:* No. That's correct. I think as—I thought as we made clear, the claims are guilt-phase issues—
*The Court:* Right.
*Defense Counsel:*—that have nothing to do with this hearing—
*The Court:* Right.
*Defense Counsel:*—and are really subsumed in part by the issues I think the Court has already denied hearings on.
*The Court:* Right. Okay?
*Prosecutor:* Nothing further.
*Defense Counsel:* I think we're actually ready.
*The Court:* Let's go.
*Defense Counsel:* We'll call our first witness.
N.T., 3/3/09, at 24–25.

Therefore, Appellant's claims in this issue have been waived. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); *Spotz*, 18 A.3d at 275 n. 17 (citing Pa.R.A.P. 302(a) in holding that the appellant had waived his *Brady* claim by failing to present it to the PCRA court); *Commonwealth v. Washington*, 592 Pa. 698, 927 A.2d 586, 601 (2007) (citing Pa.R.A.P. 302(a) in holding that the appellant's *Brady* claim, brought following dismissal of his PCRA petition, was waived).[20] Appellant is entitled to no relief on Issue 4.

> Contrary to Appellant's assertion, this exchange cannot be interpreted to mean that the PCRA court accepted his February 26, 2009 filing as an amendment to his PCRA petition. The matter was simply not addressed by the PCRA court during the hearing.

**20.** Appellant also asserts, but only in the heading to this issue, that the trial court erred by denying discovery "pertinent" to the claims presented. Appellant's Brief at 44.

Pursuant to Pa.R.Crim.P. 902(E)(2), "[o]n the first counseled petition in a death penalty case, no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of good cause." Here, the PCRA court concluded that there was no good cause to order further discovery. PCRA Court Opinion at 73 ¶ 164. We review the PCRA court's denial of Appellant's discovery motion for abuse of discretion. *Commonwealth v. Keaton*, 615 Pa. 675, 45 A.3d 1050, 1094 (2012).

Appellant does not directly address the PCRA court's determination of no good cause. Rather, Appellant simply asserts that the Hunter and Ennis statements "prove that Officer Williams was lying." Appellant's Brief at 46 n. 14. Appellant fails to address in any way the fact that he surely was aware of the identity of the passengers in his car, one of whom had suffered a gunshot wound, on May 3, 1995, the day Appellant was arrested on firearms charges. Furthermore, as Appellant acknowledges, he had already been provided with discovery concerning the May 3, 1995 incident and arrest. *See* Motion for Discovery, dated 12/8/08, at 17 ¶ 48. This discovery did not include any document that revealed the names of the passengers in Appellant's car. *Id.* In his December 8, 2008 motion for discovery, Appellant merely speculated that further documentation, which *did* reveal the names of the passengers, existed and was in the possession of the Commonwealth. Appellant offered no support for this speculation. The PCRA court did not abuse its discretion in denying Appellant's speculative discovery motion. *See Keaton, supra* at 1094 (upholding the PCRA court's denial of the appellant's discovery motion in which the appellant "essentially requested wholesale discovery of police and medical reports ... in order to discern whether his assertions were true") (quotation marks and citation omitted); *Commonwealth v. Hanible*, 612 Pa. 183, 30 A.3d 426, 483–84 (2011); *Commonwealth v. Spotz*, 610 Pa. 17, 18 A.3d 244,

38 

### 5. *Brady* Claim Regarding Fingerprint Evidence

 In his fifth issue, Appellant claims that the Commonwealth violated *Brady*, 373 U.S. at 83, 83 S.Ct. 1194, by not providing him with a report concerning the results of the analysis of fingerprints lifted from the interior of the PNC Bank, from a hard hat worn by one of the perpetrators, and from the get-away van. Appellant acknowledges that "no fingerprint evidence was produced linking [him] to the crime," but he nonetheless maintains that he "was entitled to learn, and present to the jury, affirmative evidence that fingerprint testing was done and did not match him." Appellant's Brief at 57. He also asserts that "fingerprints determined to be those of *other* identifiable persons has [sic] exculpatory value to the defense." *Id.* (emphasis in original). Finally, Appellant argues that the PCRA court erred by denying his motion for discovery of fingerprint analyses and lifts.

The Commonwealth points out that this issue was not raised at trial or on direct appeal, and so has been waived. Commonwealth's Brief at 45 (citing 42 Pa.C.S. §§ 9543(a)(3) and 9544(b)); *see also* Appellant's Brief at 57 (acknowledging that this issue was not raised at trial or on direct appeal).[21] In addition, the Commonwealth asserts that Appellant did not show that the alleged evidence existed and did not explain why he could not have raised this *Brady* claim on direct appeal. *Id.* at 45–46. Finally, the Commonwealth argues that the absence of Appellant's fingerprints from the bank vault, the hard hat, and/or the stolen van does not constitute material evidence.

The PCRA court held that Appellant did not show good cause for discovery of the fingerprint analyses and comparisons. PCRA Court Opinion at 71. The PCRA court also

322 (2011) ("Bald assertions, unaccompanied by any supporting evidence, do not constitute a showing of good cause....").

21. While agreeing with the Commonwealth that this issue was not raised at trial or on direct appeal, Appellant asserts that "a *Brady* violation overcomes any 'waiver.'" Appellant's Brief at 57. This assertion has no basis in the law of this Commonwealth as we have explained in the text, *supra*. *See* discussion of Issue 3 and n. 14.

noted that fingerprint analysis was not inculpatory of Appellant as no fingerprint evidence linked him to the crime. *Id.*

We agree with the Commonwealth that this issue has been waived because it was not raised at trial or on direct appeal. At trial, the Commonwealth presented testimony that the bank vault, the get-away van, and items inside the van had been dusted for fingerprints by police investigators. N.T., 10/18/96, at 17–26. The Commonwealth also presented testimony that, in the bank vault, one identifiable fingerprint was found, but it was not a match to any of the bank employees or the criminal suspects. N.T., 10/15/96, at 138–39.[22] There is no evidence that defense counsel ever raised any *Brady* issue with regard to the fingerprint analyses, comparisons, or report. Furthermore, Appellant provides no argument as to why this *Brady* claim could not have been raised before or during trial. Thus, this issue has been waived.

This issue is also waived for another reason, to wit, it was not raised in a timely manner before the PCRA court. Appellant acknowledges that this issue was brought before the

22. More specifically, the testimony concerning the fingerprints was as follows. On the first day of trial, counsel for co-defendant Canty raised the matter during cross-examination of Officer Trenwith, who had participated in the investigation into the murder of Officer Vaird. Canty's counsel asked Officer Trenwith if he had recovered any fingerprints in the PNC Bank. Officer Trenwith answered that he had recovered "one identifiable fingerprint in the vault room," which was not "identified to any of the bank employees or any other suspects." N.T., 10/15/96, at 138–39. On redirect, the prosecutor asked Officer Trenwith if he would expect to find fingerprints if the perpetrators had worn gloves, and, over defense counsel's objection, the officer answered "no." *Id.* at 195–96. On re-cross examination, defense counsel returned to the issue of fingerprints, questioning the officer as to why he had been unable to find more prints. *Id.* at 196–98. Officer Trenwith explained that collecting identifiable fingerprints was "pretty tough" although the investigators always tried to do so. *Id.* at 197–97. The issue of fingerprints arose again several days later when Evidence Specialist Mujica, who had participated in the investigation of the crime scene, testified that he had lifted six partial fingerprints from items found inside the stolen get-away van. N.T., 10/18/96, at 14. On cross-examination, Specialist Mujica testified that he had dusted approximately 60 items for fingerprints, including the van and its contents. *Id.* at 24. During closing argument, defense counsel emphasized that the fingerprints recovered from the bank could not be matched to Appellant or his co-defendants. N.T., 10/29/96, at 109–11.

PCRA court in his filing of February 26, 2009, of additional supplemental amendments. As we have explained in our discussion of Issue 4, Appellant's filing of February 26, 2009, was not timely, was not filed with the approval of the PCRA court, was not accepted by the PCRA court, and was not addressed by the PCRA court. *See supra,* discussion of Issue 4. Thus, this issue is also waived for failure to raise it before the PCRA court. Appellant is entitled to no relief on Issue 5.[23]

### 6. *Batson* Claim

In his sixth issue, Appellant claims that the Commonwealth improperly used its peremptory strikes in a discriminatory manner against African–Americans and women during the jury selection process, in violation of his right to equal protection under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and *J.E.B. v. Alabama,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). Recognizing that his trial counsel did make a contemporaneous objection to two of the prosecutor's peremptory strikes of African–American venirepersons, Appellant further claims that appellate counsel was ineffective for failing to raise these preserved *Batson* issues on direct appeal. Appellant's Brief at 41–42.

**23.** We must also note that this issue is entirely lacking in merit. Appellant's claim that he was "entitled to learn, and present to the jury, affirmative evidence that fingerprint testing was done and did not match him" is inexplicable as well as frivolous because **this information regarding the fingerprint analysis *was* presented at trial.** Appellant's Brief at 57; *see* n. 22, *supra* (describing the trial testimony regarding fingerprint recovery and analysis).

As Appellant acknowledges, the Commonwealth presented **no** fingerprint evidence linking Appellant to the robbery/murder. Nonetheless, Appellant asserts that a fingerprint analysis report or the fingerprint lifts themselves are "potentially exculpatory evidence," the loss of which "hampers [his] ability to present his defense." Appellant's Brief at 57. This assertion is also frivolous. We fail to see how fingerprint analysis or the lifts themselves could possibly be exculpatory of Appellant. The failure to recover Appellant's fingerprints from the crime scene or the van in no way exculpates Appellant. Similarly, the recovery of a fingerprint from an unidentified individual in the bank vault in no way exculpates Appellant. Appellant's fallacious assertions and groundless speculations do not constitute a claim.

■ In *Batson, supra* at 89, 106 S.Ct. 1712 the United States Supreme Court held that the federal Constitution's Equal Protection Clause prohibits a prosecutor from challenging potential jurors solely on the basis of race. In *J.E.B., supra at* 129, 146, 114 S.Ct. 1419 the High Court extended *Batson's* holding to encompass challenges on the basis of gender. As we have previously explained, the framework for analyzing a *Batson* claim involves the following three steps.

First, the defendant must make a *prima facie* showing that the circumstances give rise to an inference that the prosecutor struck one or more prospective jurors on account of race; second, if the *prima facie* showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror(s) at issue; and third, the trial court must then make the ultimate determination of whether the defense has carried its burden of proving purposeful discrimination. *Batson,* 476 U.S. at 97, 106 S.Ct. 1712, 90 L.Ed.2d 69.

\* \* \* \* \* \*

■ The second prong of the *Batson* test, involving the prosecution's obligation to come forward with a race-neutral explanation of the challenges once a *prima facie* case is proven, "does not demand an explanation that is persuasive or even plausible." *Purkett v. Elem,* 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Rather, the issue at that stage "is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reasons offered will be deemed race neutral." *Id.* . . .

If a race-neutral explanation is tendered, the trial court must then proceed to the third prong of the test, *i.e.,* the ultimate determination of whether the opponent of the strike has carried his burden of proving purposeful discrimination. *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769, 131 L.Ed.2d 834. It is at this stage that the **persuasiveness** of the facially neutral explanation proffered by the Commonwealth is relevant.

42

*Commonwealth v. Williams,* 602 Pa. 360, 980 A.2d 510, 529–30 (2009) (citation omitted; emphasis in original).

As we have recently reaffirmed, "a trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal and will not be overturned unless clearly erroneous." *Id.* at 531 (citing *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)). Such great deference is appropriate and warranted because the trial court, having viewed the demeanor and heard the tone of voice of the attorney exercising the challenge, is uniquely positioned to make credibility determinations. *Id.; Commonwealth v. Cook,* 597 Pa. 572, 952 A.2d 594, 603 (2008). Although the demeanor of the attorney exercising the peremptory challenge is often the best evidence as to the question of discriminatory intent, the trial court should consider the totality of the circumstances before making its ruling. *Williams, supra* at 531–32; *Commonwealth v. Spotz,* 587 Pa. 1, 896 A.2d 1191, 1212, 1214 (2006). Other relevant evidence as to the ultimate question of whether the prosecutor exercised purposeful discrimination and acted with discriminatory intent includes the following: the final composition of the jury, the race or gender sensitivity of the case, and any questionable remarks made by the prosecutor during jury selection. *See Williams, supra* at 532; *Commonwealth v. Ligons,* 601 Pa. 103, 971 A.2d 1125, 1144 (2009); *Cook, supra* at 608; *Spotz, supra* at 1212–14.

The relevant facts and circumstances underlying Appellant's preserved *Batson* challenge with regard to two African–American venire persons, specifically numbers 35 and 40, are as follows. The Commonwealth peremptorily struck venire person 35, contemporaneously explaining, without being asked to do so by the court, its reasons for the strike.

*Prosecutor King:* Peremptorily challenge. For the record, not that I'm required to, the last venire person is familiar with at least two or three of the Commonwealth witnesses.

*Prosecutor Riley:* We just received a note. We'll still exercise preemptory challenge. We just received a note. One of the officers in the room indicates that she's familiar.

*Court:* I think it is important that the record reflect that.

*Prosecutor Riley:* I think so, Judge.

N.T. *Voir Dire,* 10/10/96, at 37.

Following this exchange, another venire person was questioned and struck by the defense. *Id.* at 49. Next, venire person 40 was questioned and peremptorily struck by the Commonwealth. At this point, the defense objected to the strike of both venire persons 35 and 40, as follows:

*Defense Counsel:* Your Honor, may the record reflect out of the last three perspective veniremen, the Commonwealth has preempted two of the three. One was preempted by the defense, but the two by the Commonwealth were African Americans.

*Court:* Would you just kindly state your reasons, please?

*Prosecutor Riley:* Judge, for the last two. But if he's making a *Batson* challenge, I'll be happy to go all the way back.

*Court:* I think it is better for everyone.

*Prosecutor Riley:* Whatever you want me to. With regard to this woman [venire person 40], Your Honor, she said her son was a victim of mistaken identity, which very well may happen. That's [trial counsel's] defense. With all due respect, whatever she said at that point was—anything after that, I just—that's very troubling to us.

*Court:* Fine.

*Prosecutor Riley:* And with regard to [venire person 35], she knows one of the police officers in this case.

*Court:* I understand. I just asked for a statement. Let's move on. Okay.

*Defense Counsel:* The record doesn't reflect that the one venire was excused because she knew or someone said that she may have known—someone said she knew a police officer. She was preempted before that occurred, if you recall.

44

*Court:* Fine. Let's move on to juror number 41.

*Id.* at 54–56.

Thus, as shown by the above excerpts, when defense counsel registered his objection to two of the Commonwealth's peremptory strikes, the trial court immediately requested the prosecutor's explanation for the strikes. Although the trial court did not explicitly state that the defense had carried its burden to make a *prima facie* showing of discrimination on the basis of race, the court engaged in step two of the *Batson* inquiry, *i.e.*, the prosecutor's articulation of the reason for striking the venire person(s) at issue, which is necessary only if the defense makes such a *prima facie* showing. The trial court then accepted the prosecutor's race-neutral explanations, implicitly finding no purposeful discrimination, and moved on to questioning of the next venire person.

To support his claim of purposeful discrimination in jury selection, Appellant not only cites the above excerpts of the notes of testimony, but also relies on the number and percentage of African–American versus white venire persons peremptorily struck from the jury. Specifically, Appellant claims that the Commonwealth struck 13 of 19 African–American venire persons (68.4%), but only 4 of 24 non-African-Americans (16.7%). Appellant's Brief at 37–38. Appellant avers that these statistics constitute "compelling evidence of purposeful discrimination." *Id.* at 38. In addition, Appellant asserts that the Philadelphia District Attorney's Office employed a systematic policy and practice of discrimination in jury selection, as shown by a training videotape prepared by Jack McMahon when he was an Assistant District Attorney in the Philadelphia District Attorney's Office. Appellant's Brief at 38, 40. Appellant also cites statistics from the Administrative Office of Pennsylvania Courts to show that over nearly two decades, from 1980 to 1999, Philadelphia prosecutors peremptorily struck African–American venire persons at the rate of 55%, but struck non-African American venire persons at the rate of 22%. Appellant's Brief at 40.

We must first note that Appellant's claim of trial court error for denying trial counsel's *Batson* objection was not raised on direct appeal, and, therefore, has been waived. *See Williams, supra* at 529 (citing 42 Pa.C.S.A. § 9544(b)). However, because Appellant also claims that appellate counsel was ineffective for failing to raise this issue on direct appeal, we shall examine the underlying *Batson* claim to determine whether there is arguable merit to Appellant's claim of appellate counsel ineffectiveness. *See id.*

The PCRA court held that Appellant was not entitled to relief on his *Batson* claim, finding no error in the trial court's determination that the prosecutor did not exercise purposeful discrimination when he peremptorily struck venire persons 35 and 40. PCRA Court Opinion at 14–17. In addition, the PCRA court concluded that the statistics cited by Appellant did not establish even a *prima facie* case of discrimination. *Id.* at 14. In reaching this conclusion, the PCRA court cited the following: the Commonwealth had five peremptory strikes remaining at the end of jury selection, there was a disproportionate percentage of white persons in the randomly drawn juror pool in this case, and race was not an issue in the facts of this case.[24] *Id.* at 15 & n. 12. With regard to Appellant's claim of systematic discrimination based on the McMahon training videotape, the PCRA court relied on this Court's precedent to hold that the tape was insufficient to prove purposeful discrimination. *Id.* at 16 (citing *Commonwealth v. Uderra*, 580 Pa. 492, 862 A.2d 74, 87 (2004), and *Commonwealth v. Morris*, 573 Pa. 157, 822 A.2d 684, 697–98 (2003)). Because the PCRA court found no merit to Appellant's claims of purposeful discrimination in jury selection, the PCRA court further concluded that Appellant's claim of appellate counsel ineffectiveness for failing to raise the matter on direct appeal likewise had no merit. *Id.* at 17.

After reviewing the record and the relevant legal principles, we conclude that the PCRA court's holding is supported by

24. Appellant and Officer Vaird were both African–American. *See* Trial Court Opinion at 15 & n. 12.

46

the record and is free of legal error. The notes of testimony show that venire person 35 was peremptorily struck by the Commonwealth for two reasons: she knew two or three witnesses and she was familiar to one of the police officers. N.T. Voir Dire, 10/10/96, at 37, 55. Venire person 40 was struck because her son had been a victim of mistaken identity, which was Appellant's defense at trial. *Id.* at 55. It is clear from the notes of testimony that the trial court accepted these non-discriminatory rationales for striking the two jurors, and did not find purposeful discrimination on the part of the prosecutor. The PCRA court judge was also the trial judge in this case, and thus he had the opportunity to observe the demeanor of the prosecutor during jury selection. *See Spotz,* 896 A.2d at 1214 (in the context of a claim that the Commonwealth discriminated on the basis of gender during jury selection, stating that it is generally preferable for the trial judge also to preside over the post-conviction proceedings). Appellant has offered no rationale as to why this Court should not extend great deference to the PCRA court's ruling on the question of the prosecutor's discriminatory intent or lack thereof.

 Appellant's attempts to rely on statistics and the McMahon videotape are also unavailing. This Court has condemned, in the strongest terms, the practices described in the McMahon videotape as "flout[ing] constitutional principles in a highly flagrant manner." *Commonwealth v. Basemore,* 560 Pa. 258, 744 A.2d 717, 731 n. 12 (2000). However, we have repeatedly held that the mere existence of the McMahon videotape does not establish a general policy of racial discrimination in jury selection in the District Attorney's Office, and does not prove racial discrimination in a particular case, especially where the case was prosecuted by an assistant district attorney other than Mr. McMahon and where the trial was temporally remote from the creation of the tape. *See, e.g., Commonwealth v. Hutchinson,* 611 Pa. 280, 25 A.3d 277, 288–89 (2011) (*see also* citations contained therein); *Common-*

*wealth v. Jones,* 597 Pa. 286, 951 A.2d 294, 305 (2008); *Commonwealth v. Uderra,* 580 Pa. 492, 862 A.2d 74, 87 (2004) (in concluding that the appellant had failed to proffer any direct evidence of purposeful discrimination in jury selection, determining that the McMahon videotape was temporally and factually remote from the appellant's trial because the trial had taken place six years before the videotape was created and a prosecutor other than McMahon had represented the Commonwealth). Here, Appellant's case was prosecuted by Assistant District Attorneys Roger King and Paul Riley. Appellant has not alleged any connection between these assistant district attorneys and Mr. McMahon. In addition, the McMahon videotape was temporally removed from Appellant's case: the tape was prepared in 1987, nine years before Appellant's trial. *See Hutchinson, supra* at 289 & n. 6. Thus, Appellant has failed to proffer any evidence that the McMahon videotape had any effect on jury selection in Appellant's particular case.

Likewise, Appellant's citation of statistics does not prove purposeful discrimination in jury selection in his case. In *Ligons, supra* at 1144, we held as follows: "While it is clear that the prosecutor peremptorily struck more African–Americans than Caucasians, this fact, in and of itself, is insufficient to demonstrate purposeful discrimination when considering the totality of the circumstances."[25] Similarly, in *Commonwealth v. Dennis,* 552 Pa. 331, 715 A.2d 404, 409 (1998), where the prosecutor exercised twenty peremptory challenges, striking thirteen African–American, two Hispanic, and five Caucasian venire persons, we concluded that the composition of the impaneled jury, which included four African–American jurors and one African–American alternate, indicated a lack of racial animus. Here, although the prosecutor struck a higher percentage of African–American venire persons, Appellant acknowledges that the seated jury included 7 white and 5

**25.** Although *Ligons* was a plurality opinion, all justices joined the *Batson* analysis. *See Ligons,* 971 A.2d at 1159, 1170 (Concurring Opinion, Castille, C.J.); *id.* at 1171 (Concurring and Dissenting Opinion, Saylor, J.).

African–American jurors, and also that one of the three alternates was African–American. Appellant's Brief at 38 n. 6. Appellant cites no questionable remarks made by the prosecutor during jury selection, nor does Appellant suggest that this case was race-sensitive in any way.

For all of the reasons discussed above, we decline to disturb the PCRA court's conclusion that the trial court did not err in denying Appellant's *Batson* challenge, and accordingly, appellate counsel was not ineffective for failing to raise this meritless claim. Appellant is entitled to no relief on his sixth issue.[26, 27]

26. In the final paragraph of Issue 6, Appellant argues that the PCRA court erred by denying his request for discovery of the prosecutors' notes regarding jury selection. Pursuant to Pa.R.Crim.P. 902(E)(2), on a first counseled petition in a death penalty case, "no discovery shall be permitted at any stage of the proceedings, except upon leave of court after a showing of good cause." "A showing of good cause requires more than just a generic demand for potentially exculpatory evidence." *Commonwealth v. Bryant,* 579 Pa. 119, 855 A.2d 726, 750 (2004) (citation omitted). In light of the record relevant to Appellant's *Batson* claim and our disposition of the matter, *see* text, *supra,* we conclude that the PCRA court did not err in finding no good cause and hence in denying Appellant's motion for discovery.

27. Appellant includes in Issue 6 an allegation of discrimination against women in jury selection. Defense counsel did not raise any contemporaneous objection at trial concerning the Commonwealth's alleged discrimination against women in jury selection, and hence this claim has been waived. Although the matter could have been raised under the PCRA as a claim of ineffectiveness of counsel, Appellant has failed to develop and present reasoned argument concerning his allegation of gender discrimination. His "development" of the entire matter consists of a single statement that in one pool of 43 venire persons, the "Commonwealth struck women at a rate of fifty-two (52%) (13/25), while it struck 21% of the men (4/19)." Appellant's Brief at 38. Because Appellant has not developed or argued his claim, it is not reviewable and it is waived.

In addition, in Issue 6, Appellant claims that trial counsel was ineffective "for failing to object to the prosecutor's racially and gender biased use of peremptory strikes of *each* African American and female juror." *Id.* at 41 (emphasis in original). This claim is merely asserted—it is not explained, not developed, and not argued. It would appear that Appellant is suggesting that his trial counsel should have objected each and every time the prosecutor peremptorily struck an African–American or female venire person. Appellant offers no argument for the propriety, wisdom, or efficacy of such a practice in this case or in general. This claim is frivolous.

## 7. *Bruton* Claim

In his seventh issue, Appellant claims that the prosecutor improperly elicited trial testimony from Lynette Medley, co-defendant McGlone's wife, to the effect that co-defendant Canty, in his post-arrest statement of confession, had inculpated Appellant as the shooter of Officer Vaird. Appellant's Brief at 52–53. In Appellant's view, Ms. Medley's testimony constituted evidence that was admitted in violation of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Appellant further claims that trial counsel was ineffective for failing to request a mistrial or a curative instruction, and that appellate counsel was ineffective for failing to raise these issues on direct appeal. Appellant's Brief at 54–56.

In *Bruton*, the United States Supreme Court held that the admission into evidence of an extrajudicial statement of confession by non-testifying co-defendant A inculpating co-defendant B in the crime, violated co-defendant B's right of cross-examination under the Confrontation Clause of the Sixth Amendment. In other words, as the High Court stated subsequently in *Richardson v. Marsh*, 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), "where two defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand." In reaching this holding, the High Court reasoned that, even if the jurors were instructed to the contrary, there remained a substantial risk that they would look to co-defendant A's incriminating extrajudicial statement in assessing co-defendant B's guilt. *Bruton, supra* at 126, 128–29, 88 S.Ct. 1620; *see id.* at 135, 88 S.Ct. 1620 ("[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."); *see id.* at 137, 88 S.Ct. 1620 ("[I]n the context of a joint trial we cannot accept limiting instructions as an adequate substitute for [a co-defendant's] constitutional right of cross-examination."). Thus, in *Bruton*, the High Court created a narrow exception to the general legal principle that the jury is presumed to

follow the court's instructions. *Id.* at 135–37, 88 S.Ct. 1620; *Richardson, supra* at 206–07, 107 S.Ct. 1702.

In *Richardson, supra* at 202, 107 S.Ct. 1702 the High Court considered whether *Bruton's* holding applies when co-defendant A's confession was redacted to omit any reference to co-defendant B, but co-defendant B was "nonetheless linked to the confession by evidence properly admitted against him at trial." In answering this question in the negative, the *Richardson* Court distinguished between a confession that was incriminating **on its face** to co-defendant B (which was clearly subject to *Bruton's* rule) and a confession that was incriminating to co-defendant B **only by inference** from evidence subsequently introduced at trial. The *Richardson* Court held that the latter was not subject to *Bruton's* rule. *Id.* at 208, 107 S.Ct. 1702. Thus, the High Court in *Richardson* limited *Bruton's* holding to statements of confession by co-defendant A that were facially incriminating to co-defendant B, exempting from *Bruton's* control those statements that were incriminating to co-defendant B only after connection with or linkage to other evidence admitted at trial. *Richardson, supra* at 208–09, 107 S.Ct. 1702; *see Gray v. Maryland,* 523 U.S. 185, 191, 195, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998); *see also Commonwealth v. Cannon,* 610 Pa. 494, 22 A.3d 210, 219 (2011) (applying *Richardson* ); *Commonwealth v. Brown,* 592 Pa. 376, 925 A.2d 147, 157 (2007) (noting this Court's approval of the redaction practices permitted under *Richardson* ).

*Richardson* did not address whether a redacted version of co-defendant A's statement in which co-defendant B's name was replaced with a symbol or neutral pronoun would be admissible under *Bruton. Richardson, supra* at 211 n. 5, 107 S.Ct. 1702. However, that issue was resolved by the High Court in *Gray, supra* at 188, 192, 118 S.Ct. 1151 where the prosecution had redacted co-defendant A's confession by substituting a blank space or the word "deleted" for co-defendant B's name. A closely divided High Court concluded that the substitution of an obvious blank space, a symbol, or a word such as "deleted" for a name did not "make a significant legal difference," as compared to the original, unredacted state-

ment, and accordingly the High Court held that *"Bruton's* protective rule applie[d]." *Id.* at 188–89, 118 S.Ct. 1151; *id.* at 192, 118 S.Ct. 1151.

Here, the incriminating, extrajudicial statement at issue was given to police by co-defendant Canty on January 14, 1996, shortly after he was apprehended in Maryland. In his statement, Canty confessed to taking part in the PNC Bank robbery, along with Appellant and McGlone, and he also implicated Appellant as the shooter of Officer Vaird. Canty did not testify at trial, but Detective William Danks, the officer who took Canty's statement, read into the record before the jury a redacted version of Canty's statement in which all mention of Appellant or McGlone was removed. *See* N.T., 10/23/96, at 49–60. In Canty's statement, *as read into the record,* he admitted the following: taking part in the robbery of the PNC Bank with "other people;" pulling a gun on two female bank employees and asking for money and the location of the vault; seeing police cars outside the bank as the robbery was proceeding, and then hearing a shot and seeing "something laying there;" running from the bank and driving to an apartment where "Nette and the kids were," and then going home to sleep. *Id.* at 51–56. After Canty's statement was read into the record, the court gave a cautionary instruction, directing the jury to consider the statement only with respect to Canty because it was admissible only against Canty. *Id.* at 67.

Appellant does not challenge the admissibility of Canty's redacted statement, as read into the record by Detective Danks, under *Bruton* or any other prevailing law; [28] rather, he argues that the prosecutor improperly elicited testimony from Ms. Medley, the wife of co-defendant McGlone, allegedly informing the jury that co-defendant Canty's statement had implicated Appellant as the shooter of Officer Vaird. Appel-

---

**28.** In the appeal of his conviction for second-degree murder and other offenses, McGlone argued before the Superior Court that the admission of Canty's statement violated his (McGlone's) constitutional rights. *Commonwealth v. McGlone,* 716 A.2d 1280, 1282–83 (Pa.Super.1998). Relying on *Gray, supra,* and *Richardson, supra,* the Superior Court declined to grant McGlone any relief. *Id.* at 1282–87.

lant's Brief at 52. Appellant insists that "Medley informed the jury that *her* statement (which directly implicated Appellant) was the same as *Canty's* statement." *Id.* at 56 (emphasis in original); *see also id.* at 55 ("[T]he jury was left to believe that Canty's statement had been altered and that Canty had implicated Appellant and recounted admissions made by Appellant."). Therefore, Appellant asserts, "[t]he prosecutor, through Medley, essentially did an end run around *Bruton.*" *Id.* at 56. Appellant is mistaken for the reasons discussed below.

On January 14, 1996, Ms. Medley gave a statement to police in which she related that, on the morning of January 2, 1996, Canty, McGlone, and Appellant all came to her apartment. As set forth in her statement, Ms. Medley overheard portions of their conversation, which was incriminatory with respect to all three men, and which suggested that Appellant had shot the officer. *See* Investigation Interview Record of Lynette Medley, dated 1/14/96 (Trial Exhibit C–55). However, at trial, Ms. Medley disavowed her entire statement to police, contending that the officers had threatened to take her into custody if she did not cooperate, wanted her to corroborate someone else's statement, and wrote her statement as they wished, not as she had actually responded to their questioning. N.T., 10/18/96, at 170–74, 181, 191–93. Despite Ms. Medley's disavowal of her January 14, 1996 statement to police at trial, the Commonwealth proceeded to read into the record before the jury each of the questions she was asked by police and her corresponding answers as set forth in her statement.

After Ms. Medley's statement had been read into the record, the following exchange took place between her and the prosecutor with regard to Canty's statement. Appellant focuses his challenge specifically upon the highlighted portion of this exchange.

*Prosecutor:* The detectives . . . did they tell you that the gun found at the scene was connected to your husband?

*Ms. Medley:* No, they did not. Everything was—the only reason they wanted me down was to corroborate a state-

ment. If not, I would be held as a material witness and incarcerated.

*Prosecutor:* Whose statement did they want you to corroborate?

*Ms. Medley:* They said a Mark Canty.

\* \* \* \* \* \*

*Ms. Medley:* They had a 16 page statement that they wanted me to corroborate.

*Prosecutor:* Did they actually give you that statement?

Ms. Medley: No. I never looked at the statement.

*Prosecutor:* Did they tell you any of the contents of that statement?

*Ms. Medley:* Yes, they did.

*Id.* at 191–92 (emphasis added).

The PCRA court found no merit to Appellant's claim that this portion of Ms. Medley's testimony constituted a violation of *Bruton.* PCRA Court Opinion at 68–70. Citing *Richardson, supra,* the PCRA court explained that *Bruton* does not extend to statements that may be incriminatory to a co-defendant by contextual implication or inference. *Id.* The PCRA court also held that Appellant's derivative ineffectiveness claims accordingly must fail because counsel was not ineffective for failing to raise a meritless claim. *Id.* at 70.

The question presented—whether Ms. Medley's testimony implicated the *per se* rule of *Bruton*—is primarily one of law. Accordingly, our standard of review is *de novo* and our scope is plenary. *Commonwealth v. Hutchinson,* 611 Pa. 280, 25 A.3d 277, 284–85 (2011); *Commonwealth v. Brown,* 592 Pa. 376, 925 A.2d 147, 154–55 (2007). After thorough review of the law and the facts, we conclude that Appellant is entitled to no relief for the reasons discussed below.

In Canty's redacted statement to police, as read to the jury, he admitted that he and "other people," who remained unnamed, took part in the robbery of the PNC Bank. N.T., 10/23/96, at 51. There was no indication from Canty's statement as read to the jury that he had named to police or to

anyone else the "other people" involved in the crime. Therefore, from the jury's perspective, for Ms. Medley's statement to **corroborate** Canty's statement, the former need only implicate Canty and some "other people" as participants in the crime. Of course, Ms. Medley's statement did implicate Canty and some other people and thus did corroborate Canty's statement. We can see absolutely no rationale for invoking *Bruton* merely because Ms. Medley asserted in her testimony that police sought to question her in order to corroborate Canty's statement. The fact that Ms. Medley's statement also implicated Appellant and McGlone does not bring her testimony under *Bruton's* rule. Because Canty's redacted statement as read to the jury did not mention Appellant and McGlone, Ms. Medley's statement did not—and indeed could not— "corroborate" that Canty's statement had implicated Appellant and McGlone. One cannot "corroborate" facts that are not set forth or even mentioned.[29]

Appellant's assertion that "Medley informed the jury that *her* statement . . . was the same as *Canty's* statement," Appellant's Brief at 56 (emphasis in original), finds no basis in the facts of record. Ms. Medley did not testify as to the contents of Canty's statement; she merely claimed that police wanted her to corroborate it. Furthermore, she testified that she "never looked at [Canty's] statement." N.T., 10/18/96, at 192. Appellant does not suggest how Ms. Medley could have informed the jury that her statement was the same as another person's statement that she had never seen.

Likewise, Appellant's assertion that "the jury was left to believe that Canty's statement had been altered and that Canty had implicated Appellant and recounted admissions made by Appellant," Appellant's Brief at 55, also finds no basis in the facts of record. Canty's redacted statement was read into the record by the detective who took the statement. N.T., 10/23/96, at 49–60. This was the only direct evidence before the jury as to the contents of the statement. When the

29. Corroborate: "To attest the truth or accuracy of: confirm." Webster's II New College Dictionary, Houghton Mifflin Co., Boston, New York. (2001).

jury had left the courtroom, the prosecutor expressly stated that he had stood in such a way and the detective-witness had held the statement in such a way as to ensure that the jury could not see the statement itself. *Id.* at 61. Defense counsel made no objection to the prosecutor's assertions. We fail to see, and Appellant does not address, the mechanism by which the jury was "left to believe" that Canty's statement had been altered.

Nonetheless, if the jury found Ms. Medley's statement to police credible, despite her disavowal of her statement at trial, there is no question that it independently implicated Appellant and McGlone in the robbery and also strongly suggested that Appellant shot Officer Vaird. There is also no question that, if the jury linked Ms. Medley's statement to Canty's statement of confession in such a way as to infer that the "other people" mentioned in Canty's statement were, in fact, Appellant and McGlone, then Canty's statement became incriminating to Appellant and McGlone. But pursuant to the High Court's decision in *Richardson, supra,* we have absolutely no difficulty concluding that Ms. Medley's testimony does not raise a *Bruton* question. That Canty's statement could become incriminating to Appellant and McGlone if it were linked with Ms. Medley's statement does not bring her statement to police or her trial testimony within *Bruton's* ambit. *See Richardson,* supra at 208–09, 107 S.Ct. 1702 (limiting *Bruton's* holding to statements of confession by co-defendant A that were facially incriminating to co-defendant B and explicitly exempting from *Bruton's* control those statements that were incriminating to co-defendant B only after connection with or linkage to other evidence admitted at trial). Appellant's assertion of a *Bruton* violation is meritless.[30]

Therefore, Appellant's derivative ineffectiveness claims grounded in his allegations of a *Bruton* violation are also meritless. Trial counsel was not ineffective for failing to request a mistrial or curative instructions regarding Ms. Med-

30. We reiterate that the trial court gave a limiting instruction as to the use of Canty's statement of confession, directing that it was admissible only against Canty. *See* N.T., 10/23/96, at 67.

ley's testimony, when, for all the reasons we have discussed above, it did not implicate *Bruton*.[31] Similarly, appellate counsel was not ineffective for failing to raise a meritless issue on direct appeal.

In a second, undeveloped claim in Issue 7, Appellant asserts that the prosecutor "reinforced the *Bruton* violation," Appellant's Brief at 53, when he mentioned Canty's statement during opening argument[32] in the excerpt set forth below:

**31.** Appellant further claims that trial counsel made a "belated objection" to Ms. Medley's testimony and that the trial court recognized there was a problem, *see* Appellant's Brief at 54 (citing N.T., 10/18/96, at 192–93), apparently because it sustained the objection. However, the notes of testimony do not support Appellant's suggestion that the "belated objection" was to the portion of Ms. Medley's testimony that concerned Canty's statement. The following excerpt of the notes of testimony make this clear:

> *Ms. Medley:* [The police] had a 16 page statement [by Mark Canty] that they wanted me to corroborate.
> *Prosecutor:* Did they actually give you that statement? Ms. Medley: No. I never looked at the statement.
> *Prosecutor:* Did they tell you any of the contents of that statement? *Ms. Medley:* Yes, they did.
> *Prosecutor:* Did they mention any portion of the statement given by your husband?
> *Counsel for Appellant:* Objection.
> *Counsel for McGlone:* Objection.
> *Counsel for Appellant:* Excuse me. Calm down. Your Honor, may we see you at side-bar now?
> *The Court:* No. I will sustain the objection.

N.T., 10/18/96, at 191–92.
Appellant's counsel at this point made repeated requests for a side-bar, apparently concerned that "we're going to go in an area that should not be tread upon." *Id.* at 192. The trial court denied the request for a side-bar and directed the prosecutor to ask his next question. *Id.* at 192–93. In his next question, the prosecutor asked Ms. Medley how many questions were on her statement and whether any of the questions referred "to anything other than the interview that was being conducted by the detective." *Id.* at 193.
Thus, the notes of testimony make clear that defense counsel's objection was **not** directed at questions posed to Ms. Medley concerning Canty's statement to police, but rather was precipitated by a question concerning McGlone's statement, about which Ms. Medley gave no testimony. Thus, Appellant's assertions about the nature of this objection are refuted by the record.

**32.** Appellant asserts that the challenged comments were made during the prosecutor's closing argument. *See* Appellant's Brief at 53, 54.

*Prosecutor:* The Court will tell you that each piece of the evidence is to be taken together, in part, and in some instances separately. **You will hear from the statement of Mr. Canty how they met** that morning around 7 or 7:30. You'll hear where *they* **picked** up the—

*Defense Counsel:* Objection, Your Honor. May we see you at side-bar?

*The Court:* No. I will sustain the objection.

*Prosecutor:* You will hear the route that *they* **took,** the eight to ten minutes that it took *them* to get there.

*Defense Counsel:* Objection again, in the same vein, Your Honor.

*The Court:* Yes. I will sustain the objection.

*Counsel for Canty:* I join in the objection, Your Honor.

N.T., 10/15/96, at 37–38 (opening statement) (emphases added).

Although recognizing that counsel made objections to the prosecutor's argument, objections that were sustained, Appellant contends that trial counsel was ineffective for failing to request a curative instruction. Appellant's Brief at 54. Appellant sets forth no legal or factual argument for this claim; he merely asserts in two sentences that the prosecutor violated *Bruton* and trial counsel was ineffective. *Id.* at 53–54.

The PCRA court denied relief, concluding that the challenged comments did not constitute a *Bruton* violation because the arguments of counsel are not evidence, and because no specific reference was made to Appellant, but rather the reference was linked to Appellant only by contextual implication. PCRA Court Opinion at 55.

We agree with the PCRA court that Appellant is not entitled to relief. Appellant fails to acknowledge that the United States Supreme Court has not extended the reach of its *per se Bruton* rule to comments by counsel, which are by definition nonevidentiary. *See Commonwealth v. Brown,* 592

This is incorrect. The prosecutor made the challenged remarks during his **opening** argument. *See* N.T., 10/15/96, at 37.

Pa. 376, 925 A.2d 147, 159 (2007). We have recognized that under certain circumstances a prosecutor's comments might be so prejudicial as to raise the possibility of a *Bruton* violation, *e.g.,* if the prosecutor "discloses to the jury that the co-defendant's statement has been redacted and unequivocally identifies the defendant as the individual whose name was removed." *Cannon,* 22 A.3d at 219 (citing *Brown, supra* ). However, while we do not condone the prosecutor's implicit linkage of Canty's statement to his co-defendants, Appellant and McGlone, this is not the egregious case contemplated in *Cannon* and *Brown.* As the PCRA court noted, the trial court had instructed the jury that the prosecutor's remarks were not evidence (N.T., 10/15/96, 17). Furthermore, when defense counsel objected to the challenged statements, the trial court sustained the objection, and then, after Canty's statement was read into the record at trial, the court gave a cautionary instruction, directing the jury to consider the statement only with respect to Canty as it was admissible only against Canty. N.T., 10/23/96 at 67.

Concluding that there is no merit to Appellant's seventh issue, we decline to grant relief.

### 8. Investigation and Presentation of Mitigating Evidence

 In Issue 8, Appellant claims that trial counsel was ineffective for "failing to investigate and present the readily available and compelling mitigating evidence of Appellant's history of traumatic and unpredictable childhood; drug abuse and exposure to violence; the psychological ramifications of these experiences; and Appellant's history of Major Depression, Dissociative Episodes and other related impairments." Appellant's Brief at 58.

An evidentiary hearing was held on this issue on March 3, 4, 5, and 10, 2009, during which seventeen witnesses testified. The PCRA court addressed the matter thoroughly, setting forth its findings, credibility assessments, and reasoning in lengthy, detailed manner and specifically discussing the testimony of each witness presented during the hearing. *See* PCRA Opinion at 17–42. Based on its thorough analysis, the

PCRA court declined to grant relief, holding that Appellant had not suffered prejudice. After reviewing all the evidence of record, we conclude that the PCRA court's determination is supported by the record and is free from legal error, and accordingly, we decline to disturb its holding. In the paragraphs below, we summarize the PCRA court's findings and conclusions from the witnesses' testimony received at the PCRA evidentiary hearing.

Nino Tinari, Esq., Appellant's trial counsel, testified as to his preparation for the penalty phase of Appellant's trial. Attorney Tinari testified that his pretrial efforts were all focused on the guilt phase, and that he had utilized the twenty-four hours prior to the penalty hearing to collect evidence for that phase, securing twenty-five witnesses and preparing them to give testimony. N.T., 3/4/09, at 162, 167, 181 (cited in PCRA Court Opinion at 21). He further testified that he had some information concerning the Roney family and its dysfunction, but he did not delve into it and he did not think it was relevant to Appellant. *Id.* at 170–71, 178–79, 186–88 (cited in PCRA Court Opinion at 21). In addition, he testified that he had not hired a mental health expert because he had received no information to suggest that Appellant had psychological problems or major mental health issues. *Id.* at 168, 179 (cited in PCRA Court Opinion at 21).

Based on Attorney Tinari's testimony, the PCRA court concluded that Appellant had satisfied the first prong of the ineffective assistance standard, *i.e.*, there was arguable merit to his claim of trial counsel ineffectiveness for failing to conduct a thorough mitigation investigation. PCRA Court Opinion at 22. Regarding the second prong of the ineffectiveness standard, to wit, the reasonable basis prong, the PCRA court found defense counsel's testimony "equivocal." *Id.* The PCRA court concluded that counsel "did not conduct an investigation for mitigation purposes, but he did have a coherent strategy[, to wit,] emphasizing [Appellant's] good character." *Id.* The court found this strategy to be "arguably reasonable in light of the information that [counsel] had." *Id.* Finally, based on the testimony from other witnesses, as we

discuss below, the PCRA court determined that Appellant suffered no prejudice from counsel's action or lack thereof. *Id.* at 23.

A major defense witness at the evidentiary hearing, who was examined and cross-examined in depth, was Barbara Roney, Appellant's mother. With regard to her testimony, the PCRA court concluded as follows:

> The evidence presented by Mrs. Rooney reflects a blended family beset by tensions, imperfections, infidelity, and some corporal punishment. It also reflects an intact, hardworking, structured, and relatively stable two-parent home. It was not a perfect home, but it was not a particularly unusual situation either. This family portrait is reflected by other witnesses as well.

*Id.* at 28.

The record strongly supports these PCRA court conclusions concerning Mrs. Roney's testimony. With regard to her family life, Mrs. Roney testified that education was her "top priority" in raising Appellant and his siblings, that Appellant "adored his father," that Appellant's father never mistreated his children, that Appellant "was a joy as a child … the best thing that ever happened to [her]," and that Appellant was proud his parents lived together and they were "a happy family." N.T., 3/3/09, at 30–31, 48, 66, 91, 96. In addition, she testified that she had been on welfare, "[d]estitute, almost" during the first few years of Appellant's life; however, after receiving training, she had gotten a job, and she and her husband had both worked consistently, allowing them to feed and clothe Appellant throughout his life. *Id.* at 45–47, 140–42, 153. Mrs. Roney's testimony included an airing of certain family problems related to her husband's absences and infidelities and his children by another woman. *Id.* at 32–40, 55–60, 149–50. She testified that she was the family disciplinarian and that she beat her children for misbehaving, but did not consider it abuse. *Id.* at 62–66, 146. As described in Mrs. Roney's testimony, the neighborhood in which the family lived was violent, and she related several criminal episodes that had

occurred in the area after Appellant had reached adulthood. *Id.* at 97–99, 139–40.

Mrs. Roney also testified that her daughter, Appellant's sister, had been raped at age eleven by an uncle, but failed to tell her mother about the incident until she was eighteen. *Id.* at 70–71. Mrs. Roney also related that sexual abuse is "the thing that happens to the ladies in our family," and that several uncles in the extended family were violent and engaged in criminal conduct. *Id.* at 72, 75–85. With regard to her own health, Mrs. Roney testified that she had "highs and lows" in terms of energy level and ability to function and go to work; however, she had never seen a physician for this condition and had missed work only four or five days a year at most due to its effects. *Id.* at 88–89, 143–44.

With regard specifically to Appellant, Mrs. Roney testified that, as a child, he was "happy" to go to school, where he was in a type of advanced placement and had an excellent attendance record N.T., 3/3/09, at 129–31. However, she also testified that there had been a change in Appellant's demeanor when he became a young adult, such that he did not care about personal hygiene, slept for long hours, and did not respect his girlfriends; that she was suspicious of drug use, but never saw him using drugs of any kind; and that he went "downhill" after one of his friends was incarcerated. *Id.* at 103–105, 156–59. As also related in Mrs. Roney's testimony, Appellant had reverted to his more normal behavior in late 1995, being "excited because he had signed a new label" for his rap music, and "just [feeling] like life was taking off and it was becoming a good deal for him." *Id.* at 109, 160. When asked if Appellant had ever sought treatment for mental illness, Mrs. Roney testified "[n]ot that I know of." *Id.* at 163.

As revealed by the above summary and excerpts, Mrs. Roney's testimony strongly supported the PCRA court's conclusions with regard to this witness. Furthermore, as the PCRA court also determined, the testimony of several other family members and friends reinforced and corroborated that of Mrs. Roney. The testimony of some of these other witnesses was as follows.

Leroy Anthony Quiller, Appellant's first cousin who lived in North Carolina, testified regarding his interactions with the Roney family, with whom he had spent most holidays and summers. N.T. PCRA Hearing, 3/3/09, at 198–201. He testified that Appellant, as a child, was "always happy and always a lot of fun." *Id.* at 201–02. He also testified as to the various tensions in the household, Mrs. Roney's verbal outbursts and volatile mood changes, and her disciplinary beatings of the children. *Id.* at 203–07, 220–23. In addition, he testified that sexual abuse was common in the extended family. *Id.* at 209–11. Finally, Mr. Quiller testified as to Appellant's change in demeanor when he was about sixteen-years old, his marijuana use, his unkempt appearance, and his depression. *Id.* at 212. However, Mr. Quiller did not have information about Appellant's mood around the time period when the robbery/murder had occurred. *Id.* 228–29.

Naomi Michelle Stevens, Appellant's half-sister who lived in the Roney household for five years when she was a young teenager, testified as to her experience in the family. *Id.* at 233–35. She testified that living in the house was "emotionally draining and mentally draining and physically draining at times" because of Mrs. Roney's volatility. *Id.* at 239–40. Mrs. Roney expected the children to do their chores and homework; said hurtful ("stupid and silly, trifling, nasty") things to the children, but did not curse at them; and beat the children. *Id.* at 239–45. She testified that, at least until Appellant was sixteen, he did not do drugs or smoke, did not drink, did not get into trouble, played basketball, and was always a good kid. *Id.* at 250–51. Finally, Ms. Stevens acknowledged that she had had little contact with Appellant since he was sixteen. *Id.* at 253.

Two women who had been Appellant's girlfriends in the late 1980s and 1990s testified as to Appellant's frequent marijuana use and his lack of personal hygiene during that time. *Id.* at 265–68 (testimony of Traci Browning); *id.* at 277–78 (testimony of Jennifer Scott Dumas). Ms. Dumas acknowledged that in recent times, she had not known much about Appellant's life

and had communicated with him primarily through Mrs. Roney and only about their daughter. *Id.* at 285.

Tracy Washington, the best friend of Appellant's sister, testified that she did not see a lot of Appellant. *Id.* at 291–92. However, she had noticed a big change in Appellant at one point, when his appearance became sloppy, he became less happy, and he smoked a lot of marijuana. *Id.* at 293.

Michael Roney, Appellant's elder half-brother, had stayed with the Roney family for seven months in 1978 when he was seventeen years of age and Appellant was about nine years of age. *Id.* at 171. He testified as to tension in the household, Appellant's sister being beaten by Mrs. Roney, and Appellant crying in response. *Id.* at 172, 176, 186, 188. He further testified that he did not know Appellant had been arrested until nearly a year after the robbery/murder. *Id.* at 189.

Cornelius Dawson, a friend of Appellant's since childhood, testified that they used marijuana, alcohol, and pills, particularly Xanax. N.T., 3/4/09, at 197. He further testified that two or three years before Appellant was arrested, Appellant exhibited "some form of depression," which Dawson "kind of shared" with Appellant. *Id.* at 198, 218, 221. In addition, he testified that Appellant's parents had been supportive of his musical career. *Id.* at 209.

Richard Harrell, another friend of Appellant's since childhood, testified that through high school, Appellant had been "a very energetic and outgoing person," but that after 1990, Appellant's use of marijuana and pills (Xanax) had increased; his appearance had changed for the worse; and he had disconnected from the group activities of his friends. *Id.* at 254–58.

Thus, as the PCRA court found, the testimony of the numerous family members and friends who testified at Appellant's PCRA hearing was consistent with and corroborative of the testimony of Mrs. Roney. The testimony, taken together, supports the PCRA court's conclusion that the Roney household "reflects a blended family beset by tensions, imperfections, infidelity, and some corporal punishment[, but] also

64

reflects an intact, hardworking, structured, and relatively stable two-parent home[—] not a perfect home, but ... not a particularly unusual situation either." PCRA Court Opinion at 28.

The other focus of Appellant's PCRA hearing was the testimony of mental health professionals, including Jethro W. Toomer, Ph.D., George W. Woods, M.D., and John O'Brien, II, M.D., all of whom testified for the defense, and Timothy Michals, M.D., who testified for the Commonwealth. The testimony of each of these mental health professionals was addressed and summarized by the PCRA Court. *See* PCRA Court Opinion at 34–41. The thrust of the testimony of Appellant's mental health experts was that Appellant suffered from depression and had engaged in substantial use of drugs and alcohol at some point prior to the robbery/murder. In denying relief, the PCRA court found that the mental health evidence related to Appellant's " 'depression' [was] unconvincing and, simply, not credible" and that the time frame of Appellant's alleged mental health problems was "unclear." *Id.* at 41. The record supports the PCRA court's conclusions, as we discuss below.

Appellant's first mental health expert was Jethro Toomer, Ph.D., a clinical and forensic psychologist who met and evaluated Appellant in 2007. N.T., 3/4/09, at 30, 89. Dr. Toomer relied on the following sources in formulating his opinions: three psychological tests that he administered to Appellant, psychological evaluation of Appellant, Appellant's school records, affidavits from Appellant's friends and family members, and an interview with Appellant's mother.[33] *Id.* at 116, 94–95, 97. Dr. Toomer declined to offer a specific or formal mental health diagnosis for Appellant, acknowledging that he was not "floridly psychotic," and did not "manifest[ ] a full-blown mental illness." *Id.* at 68, 82, 116, 147. However, Dr. Toomer opined that Appellant exhibited **symptoms** or **traits** of three

33. Dr. Toomer agreed that Appellant had no mental health records (other than his presentence evaluation); no juvenile adjudications or treatment records; and no juvenile criminal history. N.T., 3/4/09, at 105–06.

mental health disorders: (1) a depressive disorder, as shown by Appellant's increased usage of drugs and his behavioral changes during a "roughly [ ] two—to three-year period prior to the crime," id. at 56–57; (2) an anxiety disorder, as manifested in "the excessive worrying, the rumination, the restlessness, the difficulty concentrating, the irritability," *id.* at 61; and (3) a borderline personality, a type of personality disorder characterized by "instability in functioning" in terms of mood, interpersonal relationships, and identity, *id.* at 63–65. Dr. Toomer further opined that Appellant's impairments adversely affected his functioning, his judgment, and his reasoning, but his "maladaptive behaviors" did not prevent him from "weigh[ing] alternatives." *Id.* at 68, 148. Notably, in no instance, did Dr. Toomer specifically relate Appellant's mental health symptoms or traits, his impairments, or his maladaptive behaviors to the robbery/murder.

Appellant's second mental health expert was George W. Woods, Jr., M.D., a clinical and forensic psychiatrist, who met and evaluated Appellant in 2008. N.T. PCRA Hearing, 3/5/09, at 24. Dr. Woods reviewed the following documents and records pertaining to Appellant's case: records of Appellant's preliminary hearing and penalty phase of trial; the psychological testing and report of Dr. Toomer; the report of Dr. Michals, *see infra;* affidavits from Appellant's family members and associates; Appellant's presentence evaluation; his school and medical records; and his musical performances on You-Tube. *Id.* at 25, 78. Based on his review of these records and his evaluation of Appellant, Dr. Woods concluded that the quantities and range of drugs that Appellant used was much greater in the time period "from 1992 to 1993 up until about the time that the [robbery/murder] occurred." *Id.* at 96. Citing a news report about Rush Limbaugh, Dr. Woods suggested that, given the complexities of life, someone "can be a drug abuser and yet ... can be role models [sic] as well." *Id.* at 106; *see* PCRA Court Opinion at 38 (noting that Dr. Woods testified "without the slightest sense of irony, that he believes drug users and role-models are not mutually exclusive").

With regard to Appellant's mental health, Dr. Woods opined that Appellant met the criteria for "a major depressive disorder" and also had symptoms of anxiety resulting from "significant chaos and violence in his family while growing up." *Id.* at 26, 72. Dr. Wood indicated that the time frame for Appellant's major depression was "during [the] period from 1993 to about 1995, 1996," although Appellant continued to have symptoms of both anxiety and, to a lesser extent, depression at the time of Dr. Woods's evaluation. *Id.* at 74; *see also id.* at 99 (wherein Dr. Woods suggested that Appellant's depression began "around '92, somewhere in there," when he had problems with his music career). In Dr. Woods's opinion, Appellant was less depressed—and more active [34]—while incarcerated on death row than he had been while making his music and living in the community. *Id.* at 75. Dr. Woods described the impairments characteristic of depression as follows: "You tend to lose focus. You tend to not be able to concentrate as well. You tend to be able to not function as well." *Id.* at 99. While Dr. Woods allowed that Appellant's parents had provided him with "a sense of the things that were right and the things that were wrong," *id.* at 118, Dr. Woods also opined that the robbery/murder was not just an aberrant act in Appellant's history, but rather was a manifestation of the impairments related to his depression. *Id.* at 118, 122.

Appellant's final mental health expert was John S. O'Brien, II, M.D., who evaluated Appellant in November 2007. N.T., 3/5/09, at 210. Dr. O'Brien opined that Appellant "has significant psychological disturbance" and "has suffered from significant depressive periods in the past, most notably prior to the offense, during which he was abusing alcohol and marijuana." *Id.* at 217, 210–11. Dr. O'Brien suggested that one of the triggers of Appellant's depression was likely to have been a downturn in his music career, id. at 226–27; however, when this issue was explored further on cross-examination, Dr.

34. As the only specific examples of Appellant's increased activity in prison, Dr. Woods testified that "he's reading[;] [h]e's in prison" and "he goes to the library and those types of things." N.T., 3/5/09, at 74–75.

O'Brien acknowledged that at the time of the robbery/murder, Appellant's career appeared to be moving forward again. *Id.* at 226–28. In addition, when asked on cross-examination about the facts and circumstances of the robbery/murder, including the necessary planning, stealing of a van, and putting on PGW uniforms prior to entering the bank, Dr. O'Brien acknowledged that "the investigative materials don't depict behavior that would suggest depression." *Id.* at 226.

Dr. O'Brien also opined that Appellant contained a "well of anger" related to the way he had been treated and disciplined as a child, particularly by his mother. *Id.* at 214–16, 232. This anger, in Dr. O'Brien's opinion, resulted in two inappropriate, violent episodes, which Appellant did not remember, but were subsequently related to him by his friends. *Id.* at 214–16. One of these incidents took place when Appellant was in fifth grade, and one more recently on the basketball court. *Id.* at 214–15. However, on cross-examination, Dr. O'Brien acknowledged that he did not "see anything in any of the materials [to] suggest[ ] that anger was a component of [the robbery/murder]." *Id.* at 234.

During the hearing, the PCRA court noted that, in Dr. O'Brien's report, he had opined that Appellant was, "at the time of the [robbery/murder,] substantially impaired in his ability to conform his conduct to the requirements of the law" due to his "severe depression [and his] associated drug and alcohol abuse." *Id.* at 223; *see also id.* at 235–38 (wherein Dr. O'Brien opined that "the constellation of variables substantially impaired [Appellant's] ability to not do what he did," *i.e.*, plan a robbery and commit murder). However, on cross-examination, Dr. O'Brien clarified that the time frame of Appellant's significant depressive period was hard, if not impossible, to specify from the information available:

> I really didn't see a close—the way the affidavits portray it, I couldn't really identify the proximity to the offense [of the period of Appellant's significant depression]. So all I could do is reach an opinion during the time period leading up to

it. I really don't know the—how specific the dates are. It doesn't really boil down to that degree of specificity.

*Id.* at 225 (Cross–Examination of Dr. O'Brien).

The PCRA court delved into this question further by asking Dr. O'Brien if he knew whether Appellant suffered from major depression at the time of the robbery/murder. Dr. O'Brien responded as follows:

I don't know exactly how [Appellant] was on the day of the offense, the week of the offense; I don't have that kind of information.

*Id.* at 239.

The Commonwealth's sole mental health expert witness was Timothy J. Michals, M.D., a physician specializing in clinical and forensic psychiatry, who evaluated Appellant and reviewed the following documents: affidavits from Mrs. Roney, Jennifer Scott, Dan Hunter, Michael Roney, Anthony Quiller, and Michelle Stevens; Appellant's 1996 presentence evaluations, which included mental health and psychiatric evaluations; notes of testimony of Appellant's preliminary hearing and of the penalty phase of trial; Appellant's school reports; reports by Dr. Woods and Dr. O'Brien; and Dr. Toomer's psychological testing of Appellant. N.T., 3/5/09, at 125, 129–30. In Dr. Michals's opinion, Appellant had no mental illness, either at the time of the robbery/murder, or at the time of evaluation. *Id.* at 131, 136. Dr. Michals testified that "nothing in the literature ... says violence is a symptom of depression or related to depression." *Id.* at 141–42. In addition, Dr. Michals explained that Appellant's commission of the robbery/murder was inconsistent and incompatible with a diagnosis of depression, citing the planning of the crime, the numerous steps involved, and the deliberate and premeditated nature of the crime. *Id.* at 143–44. Dr. Michals also looked to Appellant's other behaviors, specifically his ability to produce a song and obtain a contract with a recording company, as evidence that he was not impaired, but rather was motivated and had a goal, and was able to take the time and expend the energy to meet that goal. *Id.* at 204.

Dr. Michals strongly disagreed with the defense experts. For example, in Dr. Michals's view, the tests performed by Dr. Toomer in 2007 could not be used "to look at somebody's behavior in [1996]." *Id.* at 139–40. Dr. Michals concluded that Dr. Toomer's psychological testing of Appellant "was invalid, and showed no evidence of depression." *Id.* at 142.

After receiving all of this testimony from the four mental health experts, the PCRA court concluded that the time frame of Appellant's mental health problems was "unclear in relation to the charged crimes," and that the evidence relating to Appellant's alleged " 'depression' [was] unconvincing and [ ] not credible." PCRA Court Opinion at 41. The testimony of record supports these conclusions, and we extend great deference to the PCRA court's credibility determinations. While acknowledging that the testimony at the PCRA hearing presented "a more complete picture" of Appellant than had been set forth at the penalty-phase hearing, the PCRA court concluded that the new evidence was "insufficiently compelling to change the mind of a single juror to vote in favor of life." *Id.* at 42. Noting that the case "involved a premeditated ambush-murder of a Philadelphia police officer in the course of a bank robbery," the PCRA court held that the new evidence presented at the PCRA hearing "related to depression at some unspecified time period before the offense, drug usage, unkempt appearances or instances of corporal punishment" would not have changed the jury's verdict of death. *Id.* From our careful and thorough review of the record, we conclude that it strongly supports the PCRA court's determination that Appellant was not prejudiced by counsel's failure to present the above-summarized testimony at the penalty-phase hearing. Accordingly, we decline to disturb the PCRA court's conclusion and Appellant is not entitled to relief on his eighth issue.[35]

**35.** The dissent appears not to acknowledge the fact that the PCRA court conducted a four-day hearing, at which it heard seventeen witnesses, including four mental health professionals, specifically as to the issue of counsel's investigation and presentation of mitigating evidence at Appellant's penalty phase hearing. After hearing all of this testimony, the PCRA court concluded that the evidence of Appellant's depression was unconvincing and not credible and not correlated in time with Officer Vaird's murder. Accordingly, the PCRA court held that Appellant had

### 9. Grave Risk Aggravating Factor

In his ninth and last issue, Appellant claims that the jury's finding of the grave risk aggravating factor, 42 Pa.C.S. § 9711(d)(7), was based on improper and insufficient evidence, and that the trial court erred by failing to instruct the jury on the scope of this aggravating factor, rendering it unconstitutionally vague and overbroad as applied to Appellant. In addition, Appellant claims that his trial and direct appeal counsel were ineffective for failing to raise these alleged errors. Appellant's Brief at 65. The PCRA court held that counsel was not ineffective because the underlying claims were "meritless." PCRA Court Opinion at 42. The PCRA court opinion, however, did not set forth a complete analysis of these claims. *See id.* at 42, 56–58.

The grave risk aggravating factor is as follows:

In the commission of the offense the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense.

42 Pa.C.S. § 9711(d)(7).

We have recently summarized the general principles relevant to the grave risk aggravating factor as follows:

To determine whether the evidence establishes the grave risk of death aggravator, we consider if appellant's behavior brought someone other than the victim into a life-threatening situation. The grave risk of death aggravator applies to situations where the appellant in the course of killing his particular victim acts in a manner which endangers the lives of others close in proximity to the intended or actual victim. Sufficient evidence to support the grave risk of death aggravator exists where a nexus connects other persons in close proximity to the intended or actual victim to the zone of danger created by the defendant's actions in killing the victim. We have previously held the grave risk of death

not established that he had been prejudiced by counsel's conduct. For the reasons that we have discussed in detail in the text, *supra*, we conclude that the record supports these conclusions of the PCRA court. It is not clear if the dissent concludes that the PCRA court's extensive prejudice analysis was defective, or, alternatively, simply irrelevant.

aggravator applies where there is potential for an errant, ricochet, or pass-through bullet; the endangered bystander need not be in the direct line of fire to be in grave risk of death.

*Commonwealth v. Brown,* 605 Pa. 103, 987 A.2d 699, 707 (2009) (internal quotation marks and citations omitted); *see also Commonwealth v. Drumheller,* 570 Pa. 117, 808 A.2d 893, 909 (2002) (quoting *Commonwealth v. Paolello,* 542 Pa. 47, 665 A.2d 439, 456 (1995), for the proposition that there is sufficient evidence to support the grave risk aggravating factor when persons other than the murder victim "are in close proximity to the decedent at the time of the murder, and due to that proximity are in jeopardy of suffering real harm").

In *Commonwealth v. Rios,* 546 Pa. 271, 684 A.2d 1025, 1036–37 (1996), we held that the evidence was sufficient for the jury to find the grave risk aggravating factor in a case where the appellant killed the victim with a single shot to his head while the victim was lying on the floor of a bedroom in the presence of three other individuals, to wit, a woman lying on the floor next to the victim and another woman and her young son lying on a bed nearby. We concluded that under these circumstances, an errant bullet could have struck and killed either of the women or the child, a risk that was not reduced because the appellant filed only a single bullet. *Id.* at 1037; *see also Commonwealth v. Griffin,* 511 Pa. 553, 515 A.2d 865, 866, 875 (1986) (upon review pursuant to 42 Pa.C.S. § 9711(h)(3), concluding that the evidence was sufficient to support the grave risk aggravating factor in a case where the appellant killed the victim with a single, very close range gunshot to her head while she was attending a dance party in a crowded dormitory room).

More recently, relying on *Rios,* we held that the trial court properly left to the jury the question of whether the grave risk aggravator applied under circumstances where the appellant broke into his neighbors' bedroom where their young son was sleeping, swung a loaded gun in all directions, put the gun to the head of his female neighbor who was also in the bedroom, and then shot her husband five times, leaving shell

casings all over the bedroom. *Commonwealth v. Wright,* 599 Pa. 270, 961 A.2d 119, 146 (2008). We emphasized the danger of errant or ricocheted bullets and the fact that a bystander need not be in the direct line of fire in order to be at grave risk of death. *Id.*

However, in *Commonwealth v. Bolden,* 562 Pa. 94, 753 A.2d 793, 798–99 (2000), this Court held that the trial court erred when it left to the jury the question of whether the grave risk aggravating factor applied in a case where the Commonwealth presented no evidence that another person was nearby or within the zone of danger when the victim was killed. The facts presented at trial in *Bolden* established that a witness had been shot and injured by the defendant-appellant when the witness appeared at the scene of the murder at some time *after* the defendant-appellant had shot and killed the victim. We concluded that the grave risk aggravating factor had been erroneously applied under these circumstances and so remanded for a new penalty-phase hearing. *Id.* at 799. Similarly, in *Commonwealth v. Paolello,* 665 A.2d 439 (Pa.1995), we held that the evidence was insufficient to support the grave risk aggravating factor because the witness in question, although severely beaten, had left the scene of the murder *before* the murder victim was killed by administration of large quantities of alcohol.

Turning to the case before us, we first note, as Appellant concedes, that trial counsel did not raise any objection regarding the grave risk aggravating factor, and appellate counsel did not raise the matter on direct appeal. Appellant's Brief at 68. Accordingly, any claim of trial court error has been waived, and the only cognizable claim sounds in ineffectiveness of counsel. 42 Pa.C.S. § 9544(b). Thus, we review the testimony relevant to and the circumstances surrounding Appellant's claims of trial court error to consider whether they have arguable merit, the first prong of the ineffectiveness standard.

With regard to Appellant's claim that the evidence was insufficient to support the grave risk aggravating factor, we must point out that as part of our statutory review on direct appeal pursuant to 42 Pa.C.S. § 9711(h)(3), we held, albeit

without analysis, that the evidence was sufficient to support the finding of all three aggravating factors found by the jury, including the grave risk aggravating factor. *Roney*, 866 A.2d at 361. Thus, this claim has been previously litigated.

Nonetheless, the PCRA court determined that the testimony of Loretta Johnson and Norma Winn, the bank manager and assistant manager, respectively, at the time of the robbery/murder, was offered by the Commonwealth to support the grave risk aggravating factor. PCRA Court Opinion at 56. Ms. Johnson testified that at the time of the murder, she was lying on the floor of the bank, as she had been instructed to do by one of the assailants, not far from where Officer Vaird was shot and where she fell. N.T., 10/22–96, at 15–16. Within seconds of the gunshot that killed Officer Vaird, Ms. Johnson "proceeded to crawl a little ways to see who had got shot," and as she did so she heard the fallen officer "moaning," "a crying type of a sound, hurt type of sound." *Id.* at 16, 18. From this testimony, the jury could have reasonably determined that, while in the course of killing Officer Vaird, Appellant acted in such manner as to place Ms. Johnson in danger of suffering fatal harm due to her proximity to the victim. Thus, Ms. Johnson's testimony constituted sufficient evidence to sustain the jury's finding of the grave risk aggravating factor.

 Appellant also claims that the trial court's instructions with regard to the grave risk aggravating factor did not adequately guide the jury because the charge "merely tracked the language of the statute" without including the limitations discussed above based on this Court's decisional law. Appellant's Brief at 67. The record does not support Appellant's claim.

The trial court's charge to the jury concerning the grave risk aggravating factor was as follows:

> The statute indicates that an aggravating circumstance exists where[ ]in the commission of the offense the defendant knowingly created a grave risk of death to another person or persons in addition to the victim of the offense.

The defendant acted knowingly if at the time he committed the offense he was aware and fully conscious that his conduct was of such a nature that it was practically certain to create a grave risk of [ ] death to a person other than the deceased. In order to create a grave risk of death, it is necessary that defendant's conduct created a substantial likelihood that a person other than the deceased would be killed. It is insufficient that the defendant's conduct merely created a dangerous situation or placed another person at risk at being shot.

It is for you to determine from the facts of this case whether or not the defendant knowingly created a grave risk of death to persons other than the deceased. Again, remember, it is the Commonwealth's burden to prove this aggravating circumstance beyond a reasonable doubt.

N.T., 11/1/96, at 156–57.

Contrary to Appellant's assertions, the trial court's jury instruction as to the grave risk aggravating factor did not "merely track[ ] the language of the statute." Appellant's Brief at 67. The court's instruction did indeed begin with the statutory text of the aggravating factor, as is appropriate, but then the court further explained the text. The court's full instruction is very similar to the instruction given in *Commonwealth v. Drumheller*, 570 Pa. 117, 808 A.2d 893, 911 (2002), which we concluded "properly instructed the jury of the prerequisites for finding the grave risk of death aggravating circumstance." We reach the same conclusion here.

Thus, in sum, the record supports the PCRA court's cursory conclusion that Appellant's claims regarding the grave risk aggravating factor were meritless. Therefore, Appellant's derivative claims of trial and appellate counsel ineffectiveness must fail.

 In a final claim under this issue, Appellant asserts that the prosecutor, in his argument in support of the grave risk aggravating factor, directed the jury to focus not on the circumstances in the bank during the shooting of Officer Vaird, but rather on Appellant's confrontation with Officer

Patterson outside the bank, and on the reckless driving of the get-away driver during Appellant's flight from the bank following the murder. Appellant's Brief at 66. Appellant cites the following portion of the prosecutor's penalty-phase closing argument, placed in context.

The third [aggravating circumstance], in the commission of the offense, the defendant knowingly created a grave risk of death to another person in addition to the victim of this offense. You heard from Officer Donald Patterson, you heard Mr. Goodman Pollack earlier testify to what his duties were. You heard from the school crossing guard, you heard from Mr. Guzzi, and you heard today from the vice principal of the school nearby.

N.T., 11/1/96, at 123–24 (cited in part in Appellant's Brief at 66–67).[36]

The testimony to which the prosecutor is referring in the above excerpt is as follows. Officer Patterson, the second police officer on the scene, arrived immediately after the shooting of Officer Vaird. During the guilt phase of trial, he testified that, as he was running toward the bank, he heard a scream and a gunshot coming from the bank, and then observed Appellant running from the bank, toward a green van parked on the opposite side of the street. N.T., 10/18/96, at

**36.** As the Commonwealth points out, Appellant did not challenge this particular excerpt of the prosecutor's closing argument in his PCRA petition. *See* Commonwealth's Brief at 63 (citing Appellant's Supplemental Amended Petition for Habeas Corpus Relief, dated 12/3/07, at 95–96 ¶ 214.) Rather, in his PCRA petition, Appellant cited an excerpt that mentioned the danger to Officer Patterson, but did not mention Mr. Pollack, the school crossing guard, Mr. Guzzi, or the vice principal. *See* Appellant's Supplemental Amended Petition for Habeas Corpus Relief, dated 12/3/07, at 95–96 ¶¶ 214–15. The Commonwealth maintains that this claim is accordingly waived. *See* Commonwealth's Brief at 63 (citing *Commonwealth v. Arroyo*, 555 Pa. 125, 723 A.2d 162, 170 (1999)).

Although the particular excerpts cited in Appellant's PCRA petition and in this appeal differ, the underlying claim is the same: that the evidence concerning persons near but not at the exact site of the murder during the murder, cited by the prosecutor in his closing argument to support the grave risk aggravating factor, was not in fact relevant to the jury's deliberations on and finding of this factor. Because the underlying claim is the same and the cited excerpts sufficiently similar, we decline to hold that the claim is waived.

31–34. Appellant pointed his firearm in the direction of the officer, and the officer then fired six shots at Appellant. *Id.* at 33–34. In his trial testimony, the officer did not recall any return gunfire. *Id.* at 77. Also during the guilt phase of trial, Goodman Pollack testified that on January 2, 1996, he was driving a school bus when he saw a female police officer run toward the PNC bank. He continued to drive for about two blocks, at which time a speeding green van passed his bus, coming within about two feet of the bus. N.T., 10/16/96, at 179–81. Patricia Siddell, a school crossing guard, testified that while she was working on January 2, 1996, she observed a green van nearly hit another car, swerve around traffic, and go through two red lights. *Id.* at 183–84. John Guzzi, a tractor-trailer driver, testified that on January 2, 1996, a van went through a red light and nearly hit his truck, and he gave a description of the driver of the van. Later in the day, he recognized the van on television news, and he called police to tell them what he had seen. *Id.* at 148–52. During the penalty phase, Ann Knab, a reading assistant at an elementary school near the PNC Bank, testified that school was open on January 2, 1996, and that every day she saw children cross the street to go to the school. N.T., 11/1/96, at 30–31. On cross-examination, she testified that she did not see a green van that day. *Id.* at 32.

Trial counsel did not object to the prosecutor's argument based on the above testimony. *See* Appellant's Brief at 68. Appellant asserts that trial counsel was ineffective for failing to object, and appellate counsel was ineffective for failing to raise the matter on direct appeal. *Id.* at 68–69. The Commonwealth argues that Appellant's claim must fail because he has not shown that he was prejudiced by the prosecutor's fleeting references. Commonwealth's Brief at 63. The PCRA court did not specifically address this claim.

 However, given this Court's previous interpretations of the grave risk aggravating factor as summarized *supra,* and contrary to the prosecutor's inference, we have little difficulty concluding that the above-summarized testimony is not supportive of a finding of the grave risk aggravating factor. But,

as we have often stated, the prosecutor's arguments are not evidence. *See, e.g., Commonwealth v. Robinson,* 581 Pa. 154, 864 A.2d 460, 519 (2004); *Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385, 413 (2003). Here, the trial judge instructed the jury that counsel's arguments were not evidence, specifically instructing that counsel's closing arguments were "summations of the respective positions of the parties." N.T., 10/15/96, at 17, 19. In addition, the trial court's instructions to the jury, as discussed above, defined the grave risk aggravating factor. *See* text *supra* (setting forth the grave risk instructions to the jury which included the caveat that "[i]t is insufficient that the defendant's conduct merely created a dangerous situation or placed another person at risk at being shot."). The jury is presumed to follow the court's instructions. *See, e.g., Commonwealth v. Brown,* 605 Pa. 103, 987 A.2d 699, 712 (2009). Finally, we note that later in the prosecutor's closing argument, albeit not specifically in the context of the grave risk aggravating factor, he did remind the jury of the grave danger to the female employees in the bank at the time of the robbery/murder. *See* N.T., 11/1/96, at 125–26 ("But you heard from that witness stand the callus [sic] disregard for human life. You heard from the females, get down on your knees, open the safe, open the vault, waving the gun.").

For all these reasons, we cannot conclude that the jury could reasonably have found the grave risk aggravating factor based on the prosecutor's short reference to the testimony of Officer Patterson, Mr. Pollack, Ms. Siddell, Mr. Guzzi, and Ms. Knab in the context of the grave risk aggravating factor. The jury had already determined that Appellant shot Officer Vaird as she entered the bank, and the evidence established that, as Appellant did so, the bank manager was lying on the floor not far from the officer. We cannot conclude that, but for trial counsel's failure to object to the prosecutor's brief argument, there is a reasonable probability that the outcome of Appellant's trial would have been different. *Spotz, supra* at 260. Because Appellant has not shown that he was prejudiced by the challenged comments, trial counsel was not ineffective;

furthermore, appellate counsel was not ineffective for failing to raise the issue of trial counsel's effectiveness. Appellant is not entitled to relief on his last issue.

Concluding that none of Appellant's issues are meritorious, we affirm the order of the PCRA court denying relief.

Justice STEVENS did not participate in the consideration or decision of this case.

Chief Justice CASTILLE, Justices EAKIN, BAER and TODD join the opinion.

Chief Justice CASTILLE files a concurring opinion.

Justice SAYLOR files a dissenting opinion.

Chief Justice CASTILLE, concurring.

I join the Majority Opinion, writing separately to address supplemental points.

First, I would recognize that, to the extent that appellant's claims implicate the performance of direct appeal counsel, the High Court's refinement of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) in *Smith v. Robbins*, 528 U.S. 259, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000) and related cases provides the controlling standard. *See Commonwealth v. May*, 587 Pa. 184, 898 A.2d 559, 577–79 (2006) (Castille, J., concurring, joined by Cappy, C.J. & Eakin, J.) (surveying governing federal law). I realize that this Court has maintained a curious aversion to acknowledging this standard governing claims of appellate counsel ineffectiveness, but the standard controls nevertheless. Notably, appellant never cites the appropriate standard, nor does he attempt to satisfy it, in any of the many instances where he alleges that his direct appeal counsel was ineffective, and where such a claim must succeed before relief could issue.

Second, I would supplement the Majority's analysis of appellant's derivative *Strickland* claim arising from the Commonwealth's alleged use of its peremptory challenges in jury selection in violation of *Batson v. Kentucky*, 476 U.S. 79, 106

S.Ct. 1712, 90 L.Ed.2d 69 (1986). Majority Op. at 39–49, 79 A.3d at 618–23. This Court has explained that when a defaulted *Batson* claim is raised on collateral attack, under the necessary guise of asserted ineffective assistance of counsel, it must be analyzed in a distinct manner:

> Defaulted *Batson* claims argued through the derivative guise of ineffectiveness are not, indeed cannot, be treated the same as properly preserved *Batson* objections. *See Commonwealth v. Uderra,* 580 Pa. 492, 862 A.2d 74, 86 (2004). When there is no *Batson* objection during jury selection, "a post-conviction petitioner may not rely on a *prima facie* case under *Batson,* but must prove actual, purposeful discrimination by a preponderance of the evidence ... in addition to all other requirements essential to overcome the waiver of the underlying claim." *Id.* at 87. In the absence of such a showing, the petitioner cannot meet the *Strickland* standard. Furthermore, "[a] finding by the trial court as to an absence of discriminatory intent must be given great deference on appeal." *Commonwealth v. Spotz,* 587 Pa. 1, 896 A.2d 1191, 1212 (2006) (quoting *Commonwealth v. Jones,* 542 Pa. 464, 668 A.2d 491, 518 (1995)).

*Commonwealth v. Sepulveda,* 618 Pa. 262, 55 A.3d 1108, 1132 (2012) (footnote omitted). Appellant has not cited or attempted to satisfy *Uderra,* either in his principal brief or in his prolix reply brief; the Commonwealth specifically argued the point, citing cases applying *Uderra, see* Commonwealth's Amended Brief at 26, but the Majority does not engage it. (The Majority cites *Uderra,* but not for this governing principle.)

As the Majority notes, appellant raised a *Batson* objection at trial, but pursued no *Batson* claim on appeal: specifically, trial counsel objected to two of the prosecutor's peremptory strikes of African–American venirepersons. Majority Op. at 39–41, 41–47, 79 A.3d at 618–19, 619–22. Those objections were available to direct appeal counsel, but counsel did not pursue a claim premised upon them; thus, appellant's allegation of direct appeal counsel ineffectiveness, to the extent that

it focuses upon the claims preserved at trial, does not have to contend with *Uderra*, albeit it still must account for *Robbins*.

The vast bulk of appellant's current *Batson* allegations, however, do not involve points or arguments made at trial. Thus, these new aspects of appellant's defaulted *Batson* claim are subject to *Uderra*. Appellant's new theories also require an accounting of the actions of both trial and direct appeal counsel. For example, appellant's citation to studies and statistics presents arguments that he never raised and preserved at trial. If direct appeal counsel had raised a *Batson* claim, it would have been confined to the record at trial, including the narrow scope of the argument that trial counsel made. That record does not include any of the external materials appellant's current counsel—the Federal Community Defender Organization ("FCDO")—has gathered up and now relies upon. Speaking in terms of direct appeal counsel's stewardship in defaulting appellant's "preserved" *Batson* claim, the Majority correctly explains why the claim must fail, since the trial court accepted the Commonwealth's non-discriminatory explanations for use of those two peremptory strikes, and appellant made no argument, or showing, how this was error.

However, appellant's additional arguments, citing statistics, opinions, the "McMahon tape," and supposed "strike rates," in fact pose an entirely distinct claim that is cognizable only to the extent it sounds in layered ineffectiveness—encompassing both trial and appellate counsel. In addition to satisfying *Uderra*, and having to prove actual discrimination, appellant must show that both trial and direct appeal counsel were obliged to argue the external materials that his current counsel have amassed on collateral attack. Appellant has not attempted to show how or why his prior lawyers could have, or should have, amassed these external materials that he now claims, in boilerplate fashion, prove both the merit of his foregone claim and the incompetence of both his trial counsel and his direct appeal counsel.

With specific respect to appellant's hindsight claim premised upon peremptory challenge "strike rates" by the prosecution,

this Court has noted elsewhere that such statistics have little meaning where, as here, the defendant does not account for his own exercise of challenges, and the effect his peremptory strikes had upon the composition of the jury pool.

[A]ppellees do not account for the inevitable effect on the "pattern" of strikes created by the defense exercise of strikes. In other words, particularly in multiple-defendant cases, if the defense strikes one race of jurors at a heightened rate, it would automatically reduce the number of jurors of that race available to the prosecution for strikes. Appellees do not discuss the nature of their own strikes and the effect those strikes had upon the Commonwealth's strikes; thus, their accounting is incomplete.

*Commonwealth v. Daniels,* 600 Pa. 1, 963 A.2d 409, 433 n. 18 (2009). I explained the obvious deficiency in this approach further in *Commonwealth v. Ligons,* 601 Pa. 103, 971 A.2d 1125 (2009) (Castille, C.J., concurring, joined by Eakin & McCaffery, JJ.):

This Court is routinely presented with collateral *Batson* claims where the defense argues the Commonwealth's supposedly revealing "strike rate" without accounting for the skewing of the jury pool resulting from the defendant's own pattern of strikes. "A true assessment of strikes must account for the composition of the panel as a whole, and the conduct of other lawyers exercising strikes. It must be remembered that *Batson* works both ways: the right of jurors being at issue, neither the defense nor the prosecution may discriminate, and discriminating actions of one side, if unaccounted for, result in an incomplete picture." *Commonwealth v. Hackett,* 598 Pa. 350, 956 A.2d 978, 991 (2008) (Castille, C.J., concurring). This reality, as borne out by the possibly discriminatory defense strikes here, underscores the propriety and common sense of this Court's holding in *Commonwealth v. Spence,* 534 Pa. 233, 627 A.2d 1176, 1182 (1993), that *Batson* review requires a consideration of the totality of the circumstances.

*Id.* at 1170–71; *see also Sepulveda,* 55 A.3d at 1132 ("Appellant's argument . . . relies heavily upon bare statistical evi-

dence, focusing on the Commonwealth's strikes in isolation, with no account of the effect that his own peremptory challenges had upon the jury pool.").

Third, I write to note my express agreement with the Majority's enforcement of this Court's procedural Rules, which do not allow a PCRA[1] petitioner to simply amend his petition or claims at will, and at any time; rather, the Criminal Rules require that the court grant leave to amend in order to amend the filing. *See* Majority Op. at 31–37, 41–47, 79 A.3d at 613–16; *see also* Pa. R.Crim.P. 905(A); *Commonwealth v. Porter*, 613 Pa. 510, 35 A.3d 4, 12 (2012). This is a common FCDO tactic: to keep "amending" or "supplementing" prior petitions and claims, building in more delay, and creating more burden upon the Commonwealth and the PCRA courts. *See, e.g., Commonwealth v. Edmiston*, 619 Pa. 549, 65 A.3d 339, 357 (2013) (FCDO motion for DNA testing belatedly forwarded in context of serial PCRA petition years after petition was initiated (causing stay of federal *habeas* review) and only as serial petition was approaching decision; held: "our own review of the record and circumstances surrounding Appellant's post-conviction DNA testing request leads to the conclusion that this motion was untimely as a matter of law and was forwarded only to delay further the execution of the sentence."); *See also Porter*, 35 A.3d at 15–17, 22–23; *Commonwealth v. Spotz*, 610 Pa. 17, 18 A.3d 244, 329 (2011) (Castille, C.J., concurring, joined by McCaffery, J.). The PCRA courts are not obliged to indulge strategies of delay. The trial court in this case stated the point succinctly: "Defense counsel has raised an unending litany of issues and at some point this court has to adjudicate the claims before it." PCRA Court Slip Op. at 73–74, ¶ 167.

Moreover, to the extent PCRA "supplements" and "amendments" attempt to raise new claims, as here, trial-level courts are not obliged to indulge such sabotaging of the PCRA's jurisdictional time-bar. *See Porter*, 35 A.3d at 11–15. *See also Commonwealth v. Moore*, 569 Pa. 508, 805 A.2d 1212, 1225 (2002) (Castille, J., concurring and dissenting, joined by Newman & Eakin, JJ.) ("[T]here is something to be said for a

---

1. Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–46.

construction [of the PCRA time-bar] that would limit the petitioner to claims that were identified in his petition in a timely fashion, while, of course, permitting amendment to develop and support the timely-identified claims. Significantly, that is the approach the U.S. Court of Appeals for the Third Circuit has taken in construing the federal *habeas corpus* statute of limitations. *See United States v. Duffus,* 174 F.3d 333, 337 (3d Cir.1999) (stating that district court was correct in denying petitioner's motion to amend to add new claim filed after time allowed for appeal, because allowing such amendment would frustrate very intent of Congress in creating time-bar). There is obvious force to such an argument; indeed, a contrary rule, permitting endless and untimely amendments to add new substantive claims ... would totally eviscerate the PCRA time-bar.").

Finally, I write to note concerns with the initial brief the FCDO filed in this case. In my Concurring Opinion in *Commonwealth v. Spotz,* I detailed the tactics of the FCDO in that capital PCRA matter, including tactics of delay; I also described in great detail the abusive and improper brief that the FCDO had filed. The FCDO brief in *Spotz* was exactly 100 pages; that length was a result of this Court's indulgence since, by the Rule in effect at that time, briefs were not to exceed 70 pages without leave of court. I noted in my concurrence that the FCDO had flouted that indulgence by dispensing with several of the required elements of a brief, such as a Statement of the Case, thus creating space for the FCDO to burden the Court with more claims. I described with specificity other abuses in the Brief:

> The Brief pretends to raise "only" 20 issues, which would be burdensome enough. But, within those twenty claims are multitudes of additional claims or sub-claims. My conservative count of the total number of distinct "claims" presented in the Defender's Brief, including both derivative and subsidiary allegations, exceeds 70. How does the Defender manage to "litigate" 70 claims in a 100–page brief? It employs a number of additional tricks.

For example, in 100 pages of Brief, the Defender includes no less than 136 single-spaced footnotes, many of extreme length, and then routinely advances distinct substantive arguments in those footnotes. *See, e.g.,* Initial Brief of Appellant, nn. 15, 18, 20–29, 32–33, 37–39, 43–51, 53, 59, 61–70, 72–77, 79–85, 94–95, 103, 107–18, 123–25, 127–34. The Defender also seizes more briefing space by single-spacing, and not indenting, its Statement of Questions Presented, making them virtually unreadable in the process. *See, e.g., id.* at 2 (containing 40 single-spaced lines of text running margin to margin). Another common Defender abuse, immediately recognizable to those of us charged with attempting to read their Briefs, is to list distinct claims or sub-claims by single-spaced bullet point in text, essentially doubling the number of points to be made. To make the abuse worse, these bullet points often simply declare the sub-claims without development or legal support; other times, the Defender will append footnotes, which may contain factual support or substantive argument, or may provide no meaningful development or explanation of the relevance of bald citations. *See, e.g., id.* at 29–30 & nn. 27–29; 47–48 & nn. 53–57; 53; 64–65 & nn. 82–83; 66–67 & nn. 86–92; 71–72 & nn. 96–101; 75–76; 83; 95–98 & nn. 125–34. The time-consuming burden is then placed on the Court to attempt to decipher the arguments.

18 A.3d at 333–34. I also stressed the untoward burden that these FCDO abuses placed upon both trial-level PCRA courts and this Court. I also noted that the FCDO had taken to making complaints about delay in capital cases, including a complaint in a federal case, *Commonwealth v. Dougherty,* 585 CAP, which falsely accused this Court of bearing prime responsibility for capital case delay. The *Porter* Court briefly described the federal pleading in *Dougherty* as follows:

The *Dougherty* pleading alleged, among other things, that this Court was the primary cause of delays in Pennsylvania capital cases, indeed that this Court was indifferent to, "and incapable of managing," its capital docket. The *Spotz* concurrence offered examples from capital cases, including

many adverted to by the FCDO in its federal motion in *Dougherty,* where the FCDO's conduct was the primary cause of delay, a fact the FCDO had inexplicably failed to disclose in *Dougherty.*

35 A.3d at 22.

In light of the FCDO's disingenuous complaints about delays in capital cases, given that organization's central role in creating such delays, as well as other factors detailed in the *Spotz* concurrence, I made the following suggestions respecting appellate briefing in capital PCRA matters, "[t]o curb the rampant abuses in this case and other cases":

(1) Direct the Supreme Court Prothonotary to immediately reinstate a briefing limit of 70 pages in capital PCRA appeals, with no exceptions absent: (a) a showing of extraordinary circumstances; and (b) the explicit concurrence of the Commonwealth.

(2) Direct the Supreme Court Prothonotary to amend briefing notices to advise parties that: (a) substantive arguments and sub-arguments are not to be set forth in footnotes or other compressed texts, such as block quotes or single-spaced bullet points, since such practices facilitate violation of the restrictions on the length of briefs; and (b) arguments set forth in such fashion will not be considered. I would also refer the matter to the Appellate Procedural Rules Committee to recommend changes to our Rules to curb these abuses, including: (a) limitations on the number of words in a brief, such as are found in the Federal Rules, and (b) required certification from counsel that the brief is compliant.

18 A.3d at 349 (Castille, C.J., concurring, joined on this point by McCaffery & Orie Melvin, JJ.).

Beginning immediately after the decision in *Spotz,* the Court as a whole implemented measures along the lines of my suggestions. For example, the Court's briefing notice in capital PCRA appeals was amended to provide that page limitations would be strictly enforced; that "substantive arguments and sub-arguments are not to be set forth in footnotes

or other compressed texts, such as block quotations or single-spaced bullet points"; and that points set forth in such a manner would not be considered.

Thereafter, the Appellate Court Procedural Rules Committee responded to the concerns by proposing revisions to the Appellate Rules to rein in the kind of abuses found in the FCDO brief in *Spotz*. These revisions were approved by this Court in an order entered on March 27, 2013, effective in sixty days. Tracking aspects of the federal rules of appellate procedure, the revisions set forth restrictions on the font size used in briefs and changed the method by which to measure the length of briefs. *See* Pa.R.A.P. 124 & 2135. A principal brief, for example, is now limited to 14,000 words, unless the brief does not exceed thirty pages. The revised rules also require that counsel file a certificate of compliance if, for example, a principal brief exceeds thirty pages and is measured by use of the word count alternative. *Id.*

This appeal was pending when *Spotz* was decided, already having been briefed and submitted. Soon after *Spotz* was decided, however, this Court acted upon the fact that the FCDO brief in this case was abusive in the same fashion as the *Spotz* brief had been. Thus, by *per curiam* order, the Court directed that a conforming brief be filed:

AND NOW, this 9th day of June, 2011, upon review of the briefs in this submitted capital PCRA appeal, the Court has determined that counsel for Appellant [the FCDO] have filed a brief that does not conform with the Pennsylvania Rules of Appellate Procedure.

The non-conforming brief does not contain a Statement of the Case, the inclusion of which is described and is mandatory, pursuant to Pa.R.A.P. 2111(a)(5) and Pa.R.A.P. 2117. In addition, while purporting to raise thirteen issues, in actuality, by conservative count, the brief raises over seventy issues, many of which are undeveloped. Further, counsel have burdened the Court with seventy-eight single-spaced footnotes, many of which purport to raise substantive arguments. Accordingly, the indulgence of the Prothonotary's May 4, 2010 administrative order granting leave to file a

brief in excess of page limitation set forth in Pa.R.A.P. 2135(a)(1) having been abused, that order is hereby VA-CATED.

The Prothonotary is to return the Initial Brief for Appellant, along with the Appendix of Initial Brief of Appellant, to counsel for Appellant to file a brief conforming to the Rules of Appellate Procedure within thirty days of this order. ...
Page limitations will be strictly enforced, and substantive arguments and sub-arguments are not to be set forth in footnotes or other compressed texts such as block quotations or single-spaced bullet points. Such practices facilitate violation of the restrictions on the length of briefs, and arguments set forth in such fashion will not be considered.

Order, 6/9/11.

The Court's decision today, by a Majority Opinion in excess of seventy pages, is in response to the conforming briefs we directed in the wake of *Spotz*.

It is also notable, given the FCDO's claims respecting delay in capital cases, that before filing its initial brief here, the FCDO requested seven extensions of time, including three requests forwarded after a directive that no further extensions would be granted. Those seven requests alone caused over seven months of delay. In all but the last of its extension requests, the FCDO cited to its workload, including its workload in state PCRA matters. Since the FCDO's "voluntary" activities involving first-petition capital PCRA matters are not by way of federal court appointment, every delay occasioned by the organization due to manpower or workload is chargeable to the FCDO's extensive private agenda in state court which, it is apparent, includes strategic delay. In the future, unless the FCDO is acting pursuant to explicit federal court appointment and authority to pursue an initial PCRA petition, I would not accept FCDO workload as a relevant or legitimate basis for delay in the PCRA courts, or on appeal in this Court.

Justice SAYLOR, dissenting.

As to the treatment of guilt-phase claims, I favor evidentiary development, consistent with my position expressed else-

where. *See, e.g., Commonwealth v. Keaton,* 615 Pa. 675, 749–
50, 45 A.3d 1050, 1095 (2012) (Saylor, J., concurring and
dissenting). I continue to believe that "the absence of an
adequate factual foundation for consideration of capital post-
conviction claims encourages unwarranted analytical shortcuts
in the appellate review." *Id.*

For example, Appellant challenges his trial counsel's stew-
ardship in failing to investigate the involvement of another
man, Travis Hall, in the robbery/murder, who shared similar
physical characteristics with Appellant. In part, the PCRA
court and the majority respond to this claim by pronouncing
that "trial counsel's strategy in not attempting to blame the
murder on Hall was reasonable[.]" Majority Opinion, at 19, 79
A.3d at 605 (summarizing the post-conviction court's reason-
ing); *id.* at 20, 79 A.3d at 606 (crediting such reasoning). As
Appellant points out, however, we know nothing of counsel's
strategy pertaining to Hall, since the PCRA court refused to
permit Appellant to make an evidentiary record. *See, e.g.,*
Initial Brief of Appellant at 31 ("There is no reason to believe
that trial counsel had any 'strategy' concerning Hall."). In
this regard, the reviewing courts appear to be engaging in the
practice of inferring, or extra-record "gleaning" of, the content
of a defense strategy, a practice which I thought we had
eschewed. *See, e.g., Commonwealth v. Duffey,* 579 Pa. 186,
205, 855 A.2d 764, 775 (2004); *cf. Wiggins v. Smith,* 539 U.S.
510, 526–27, 123 S.Ct. 2527, 2538, 156 L.Ed.2d 471 (2003)
(admonishing that courts are to avoid "*post hoc* rationalization
of counsel's conduct").[1] Moreover, since counsel are charged

---

1. Notably, Appellant's trial counsel, by his own admission, performed
no pre-trial investigation relative to a central aspect of the defense case
in one critical phase of trial, *i.e.,* the penalty phase. *See* PCRA Court
Op., *slip op.* at 22 (acknowledging that Appellant's trial counsel "did
not conduct an investigation for mitigation purposes"). Accordingly, I
believe the reviewing courts should be more circumspect concerning
the extra-record assumption that counsel acted appropriately with
regard to the other critical phase. *Cf. Commonwealth v. Sneed,* 616 Pa.
1, 38, 45 A.3d 1096, 1118 (2012) (Saylor, J., dissenting) ("Given the
extent of the patent ineffectiveness we have seen in a fair number of
these cases (including this one relative to the penalty phase at least), I
maintain that such claims should be decided on a reasonably developed
record." (citation omitted)). Indeed, with regard to summary dismiss-
als, inferences should be made most favorably to the non-moving party.

with the obligation to conduct a reasonable investigation in the first instance to support their strategic choices, it is axiomatic that some assessment of the underlying investigation must be made before a strategic choice reasonably can be credited by a reviewing court. *See, e.g., Commonwealth v. Williams,* 597 Pa. 109, 125, 950 A.2d 294, 304 (2008) ("Strategic choices made following a less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitation of the investigation." (citing *Strickland v. Washington,* 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984))).[2]

The majority offers another reason for rejecting Appellant's claim, which might seem to obviate the otherwise-essential inquiry into the adequacy of counsel's investigation, namely, Appellant's failure to produce an affidavit or other evidence concerning the extent of counsel's inquiry. *See* Majority Opinion, at 19–21, 79 A.3d at 606–07. The majority, however, does not discuss the requirement for post-conviction courts to issue reasonable pre-dismissal notice of the reasons why claims are being summarily dismissed, thus providing a reasonable opportunity to amend or supplement (or request leave to do so where necessary). *See* Pa.R.Crim.P. 909(B); *see also Commonwealth v. Smith,* 609 Pa. 605, 679, 17 A.3d 873, 916 (2011) (Saylor, J., dissenting) ("In my view, the Court must require uniform, strict adherence to the requirement of pre-dismissal notice containing reasonably specific notice of pleading deficiencies or other reasons for summary dismissal and uniformly dispense hearings where credibility matters are materially in issue."). *See generally Commonwealth v. Williams,* 566 Pa. 553, 568–69, 782 A.2d 517, 526–27 (2001). Here, the PCRA court did not afford Appellant pre-dismissal notice that his petition was lacking by virtue of his failure to

---

**2.** With regard to the penalty phase, the PCRA court again overtly disregarded the requirement of an adequate investigation to support a finding of reasonable strategy. *See* Majority Opinion, at 59, 79 A.3d at 630 ("The PCRA court concluded that counsel 'did not conduct an investigation for mitigation purposes, but he did have a coherent

tender an affidavit from counsel. Therefore, I fail to see that such omission is an available basis, on appellate review, to now bolster the post-conviction court's summary dismissal of the claim. *Accord id.* (refusing to credit a basis for dismissal of a PCRA petition which was not fairly subsumed, on a reasonably developed basis, within the pre-dismissal notice).[3] inappropriate

Furthermore, we have very good cause for circumspection about the performance of Philadelphia-based capital defense counsel, at least, given our exercise of extraordinary jurisdiction and appointment of a special master to consider a petition challenging Philadelphia's compensation system for such counsel. After a hearing, our special master reported his findings that such system, in effect at the time of Appellant's trial, was "grossly inadequate," "completely inconsistent with how competent trial attorneys work," "punishes counsel for handling these cases correctly," and "unacceptably increases the risk of ineffective assistance of counsel in individual cases." Report and Recommendations in *Commonwealth v. McGarrel,* 77 EM 2011, CP–51–CR–0014623–2009 (C.P.Phila.Feb.21, 2012); *cf. Commonwealth v. King,* 618 Pa. 405, 447–55, 57 A.3d 607, 633–38 (2012) (Saylor, J., concurring specially) (cataloguing anecdotal evidence of systemic deficiencies in the scheme of defense for indigent capital defendants). While this Court has not formally reviewed these findings, at the very least they suggest against sanctioning the use of summary dismissals skirting governing law and procedural protections at the post-conviction stage.[4]

strategy[, to wit,] emphasizing [Appellant's] good character." (citation omitted)).

3. I also have difficulty with the practice of requiring an affidavit or declaration of counsel in the post-conviction process. Obviously, since counsel's stewardship is generally under attack by the petitioner on collateral review, counsel may not be cooperative, and, thus, the petitioner may be relegated to adducing proof through what effectively amounts to cross-examination.

4. I have further noted my concern with the disparities in the way summary dismissals are administered amongst the various post-conviction courts. *See, e.g., Commonwealth v. Simpson,* 620 Pa. 60, 115, 66 A.3d 253, 286 (2013) (Saylor, J., dissenting) ("I dissent in favor of requiring reasonable compliance, in our post-conviction courts, with the rules and principles which are supposed to govern their review.").

As to the penalty, I also have difficulty with the PCRA court's analysis, *see, e.g., supra* note 2, credited by the majority. Moreover, I incorporate previous comments I have made about the troublesome nature of affirming on the basis that a hypothetical trial, at which a defendant is assumed to have been represented by competent counsel, would have led to the same result. *See, e.g., Commonwealth v. Koehler,* 614 Pa. 159, 227–28, 36 A.3d 121, 162 (2012) (Saylor, J., concurring). In any event, one matter we seem to agree on here, at least, is that Appellant was atrociously underrepresented relative to the penalty portion of his actual capital trial. *See* PCRA Court Op., *slip op.* at 22 (acknowledging that Appellant's trial counsel "did not conduct an investigation for mitigation purposes").